**Howard B. PETERSON, III, Appellant,**

v.

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, William Robert Koontz, William Graham Mathis, David Bruce Crouch, Arthur Ralph Magill, Does 1 through 200, Appellees.**

No. 84–1186.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 1984.

Decided April 15, 1985.

Rehearing and Rehearing En Banc Denied May 29, 1985.

Robert F. Gore, Springfield, Va. (Rex H. Reed, Springfield, Va., Hamilton Horton, Horton, Hendrick & Kummer, Winston-Salem, N.C., on brief) for appellant.

Gary Green, Washington, D.C. (Daniel S. Kozma, Washington, D.C., on brief) for appellees.

Before WIDENER and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

MURNAGHAN, Circuit Judge.

Appellant Howard B. Peterson, III, a former pilot for Piedmont Aviation, Inc. ("Piedmont"), has alleged that the Airline Pilots Association, International ("ALPA") and known and unknown union members coerced Piedmont into firing him for failing to respect a nationwide ALPA sponsored job action. Peterson contends that the union thereby failed to live up to its duty of fair representation and, together with individual pilots, violated North Carolina law prohibiting blacklisting, conspiracy, and interference with a contractual relationship. In two orders granting summary judgment in favor of ALPA, the district court ruled that Peterson's state law claims were preempted by the Railway Labor Act, that punitive damages could not be assessed against union defendants, and that Peterson's duty of fair representation claim was time barred.

### I.

From May 1977 to January 1979 Peterson was a replacement pilot for Wien Air Alaska, Inc. during a nationwide ALPA sponsored strike. As part of the agreement ending Wien's labor dispute, striking pilots replaced non-union pilots, non-union pilots were furloughed, and ALPA promised there would be no reprisals or recriminations against pilots who had flown during the strike.

In May 1979 Peterson was hired by Piedmont Airlines. All Piedmont employees were represented by ALPA and were protected by the ALPA-Piedmont collective bargaining agreement.[1] Peterson flew without incident until a fellow Piedmont pilot learned, some time in July 1979, that Peterson previously was a strike-breaker. Over the next several weeks, the complaint alleges, Peterson was harassed by individual pilots and ALPA sponsored a slowdown of flight operations designed to pressure Piedmont into firing Peterson. Peterson further alleges that on or about August 2,

---

1. Peterson had no written employment contract with Piedmont and was protected only by the terms of the collective bargaining agreement. Under the agreement, Peterson was a probationary employee for the first twelve months and could be discharged at Piedmont's discretion.

1979 he was taken off active flight duty by Piedmont and was told to find employment elsewhere. Peterson, however, apparently was paid by Piedmont until he secured another job with a different airline.

In July 1980, eleven months after the date of his alleged termination, Peterson filed a complaint in federal court claiming that he had been blacklisted by ALPA. His first complaint contained seven causes of action, including claims that Piedmont violated the Railway Labor Act, 45 U.S.C. §§ 151 et seq. (1982) ("the RLA"),[2] breached the contract of employment and did not live up to its duty of good faith and fair dealing. The complaint also asserted causes of action against ALPA alleging a breach of the duty of fair representation, blacklisting intentional interference with a contractual relationship, and civil conspiracy. The complaint sought punitive damages against all parties. The defendants answered the complaint, and, for the next several years, extensive discovery ensued.

On January 27, 1983 the district court, on motions for summary judgment by ALPA, entered an order dismissing six of Peterson's seven causes of action. The court held that appellant's state tort claims were preempted by the RLA (thus dismissing claims against individual union members), that punitive damages against ALPA were unavailable under the RLA, and that appellant failed to state a cause of action against Piedmont for interfering with union activi-

ties. The district court denied summary judgment, and left outstanding Peterson's claim against ALPA for breach of the duty of fair representation.

In that same order Peterson was granted leave to amend his complaint within thirty days to add Piedmont to his claim against ALPA for a breach of its duty of fair representation. On February 23, 1983 Peterson filed a second amended complaint,[3] however, because the amended pleading went beyond the scope of the district court's order, the complaint was stricken on August 11, 1983. On August 19, 1983 Peterson filed his third amended complaint.[4]

While appellees' motion to strike the second amended complaint was pending, the Supreme Court on June 8, 1983 ruled in *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) that a uniform six month limitation period applies to hybrid duty of fair representation claims under the National Labor Relations Act. On August 29, 1983 ALPA filed its amended answer wherein, some three years after Peterson originally accused the union of breaching its duty of fair representation and three years after ALPA first joined issue by answering the initial complaint without asserting a time-bar, for the first time raised a limitations defense. Piedmont's answer similarly asserted that appellant's fair representation claim was

**2.** In 1936, Congress extended the RLA to the air transportation industry. *See* 45 U.S.C. §§ 181–188 (1982).

**3.** On March 29, 1982 Peterson had unsuccessfully moved to file a first amended complaint. The motion was denied because the proposed amendments were unduly delayed and sought to bring in additional parties which, according to the district court, would prolong the litigation to the prejudice of ALPA.

**4.** There was no change of substance between the pleading of the claim of breach of duty of fair representation in the initial complaint and the allegations of that cause of action in the third amended complaint. The initial complaint alleged that:

> The defendant ALPA breached its duty of fair representation to the plaintiff by instigating, directing, controlling and participating in a

conspiracy to injure the plaintiff. The outrageous and unlawful conduct alleged in paragraphs 1 through 32 demonstrates that the defendant ALPA's actions were arbitrary, discriminatory and in bad faith.

The third amended complaint recites:

> Defendant ALPA, as plaintiff's exclusive bargaining representative while he was employed by Piedmont and while listed on the WIEN pilot seniority roster, breached its duty of fair representation owed to plaintiff by its arbitrary, discriminatory, and bad faith actions as hereinabove alleged, thereby directly and proximately damaging the plaintiff. These actions against plaintiff were committed willfully, intentionally, wantonly, maliciously, vexatiously, and for oppressive reasons.

time-barred. Motions to dismiss the complaint were filed and, on January 14, 1984, the district court granted defendants' motions. Since that time Peterson has settled his dispute with Piedmont, but he appeals the January 27, 1983 and January 14, 1984 orders insofar as they relate to ALPA and individual union members.

## II.

Normally, the first issue we should have to consider would be the length of the applicable limitations period, whether the six months announced in *DelCostello*, the two year period found in 45 U.S.C. § 153 First (r), or a time span lasting one year or possibly three years as provided by the most analogous North Carolina statute.[5] That issue, however, currently engages the attention of another panel of the Court.[6] It is not profitable for us to complicate the matter since, on our view of things, even assuming that the shorter six months limitations period applies, nevertheless, time-bar has not occurred. That is so because the case established a principle of law new enough that neither Peterson in filing his complaint, nor ALPA in answering it, sought to take advantage of the new principle. ALPA, by failing to raise a limitations defense for three years after the case was initiated, has waived its right to rely on *DelCostello*.

▮▮▮ The initial complaint against ALPA was answered on September 8, 1980 without any reference to limitations as a defense against the duty of fair representation cause of action. That cause of action was initiated eleven months after its accrual, and it was not until August 29, 1983 that ALPA decided to press for summary disposition on grounds of limitations. It is well settled that the defense of limitations is waived unless asserted promptly by way of answer or motion. *See Weinberger v. Salfi*, 422 U.S. 749, 764, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975); *Hayden v. Ford Motor Co.*, 497 F.2d 1292, 1293–95 (6th Cir.1974); *Strauss v. Douglas Aircraft Co.*, 404 F.2d 1152, 1154–56 (2d Cir. 1968); Fed.R.Civ.P. 8(c). *See also Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1287 (7th Cir.1977). Although waiver is not automatic, requiring a showing of prejudice or unfair surprise, *see generally* 5 Wright & Miller, *Federal Practice and Procedure* § 1278 (1969 & Supp.1984), we are persuaded by considerations of fairness, entirely separate from the extensive investment of time and energy expended on discovery before the action was dismissed on limitations grounds.

▮▮▮ Under traditional jurisprudential principles Peterson, as plaintiff, is charged with anticipating that the Supreme Court would establish the six months limitations period for his duty of fair representation claim. At the same time what is sauce for the goose is sauce for the gander—fairness calls for uniform application of the same principle to the defendant, in that ALPA had as much cause to anticipate *DelCostello* as did Peterson. Had ALPA shown the necessary perspicacity so to plead to the original complaint, Peterson would have no viable basis to attack a limitations defense. In such instance ALPA would have been entitled to a complete victory at the early pleading stage, regardless of the strength of plaintiff's claim on the merits.[7] ALPA's

---

5. North Carolina provides a one year statute of limitations for intentional torts; *see* N.C.Gen. Stat. § 1–54 (1983), and a three year period for simple negligence; *see* N.C.Gen.Stat. § 1–52 (1983). If reference to either North Carolina statute is appropriate, Peterson's complaint would have been filed timely regardless of how his duty of fair representation claim is characterized.

6. *Zemonick v. Consolidation Coal Co.*, No. 84–1353 (4th Cir. argued 10/3/84).

7. By the same token, if Peterson's counsel had exhibited a like perspicacity, the action would presumably have been filed within six months and we would have been spared the necessity of separating here the wheat from the chaff. For ALPA to prevail on the grounds of unanticipatability would really be unfair, for Peterson then should also benefit from the same contention. Then, perhaps, *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) would apply to make the bringing of the action timely.

brief implies that it could not have raised a statute of limitations defense until after *DelCostello* was decided, but certainty of success is not a prerequisite to deciding whether to assert an affirmative defense in a pleading.[8] *See Perez v. Dana Corp.*, 718 F.2d 581, 584 (3d Cir.1983) where the union defendants several years before *DelCostello* was decided anticipated the result in that case and raised a six-months limitation defense.[9] Consequently, since neither side anticipated *DelCostello* Peterson is entitled to a safe harbor. In short we leave the parties where we find them.

The same result should obtain despite the fact that Peterson filed a series of amended complaints.[10] It is true that, in cases where, from the very outset, no cloud obscured the right of the defendant to plead limitations, courts have permitted defendants to raise limitations even though not asserted as a defense in the original answer. *See, e.g., Pierce v. County of Oakland*, 652 F.2d 671 (6th Cir.1981).

Here, however, the eclipse was great enough to convince counsel for both parties that neither the threat nor the advantage of limitations was present. In the present case ALPA was on notice since July 7, 1980 that Peterson was asserting a breach of the duty of fair representation. Subsequent amendments to the complaint did not affect the substance of the claim; consequently, for all practical purposes ALPA waited for over three years before raising a limitations defense.

Equally important, the statute of limitations set out in *DelCostello*, although serving national labor policies,[11] is still a personal defense. As such it is "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber.... The theory is that even if one has a just claim it is unjust not to put an adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute

**8.** It is significant that ALPA made no move to raise a limitations defense in 1981 based on Justice Stewart's concurring opinion in *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 65–71, 101 S.Ct. 1559, 1565–68, 67 L.Ed.2d 732 (1981) (concurring in part and dissenting in part). In *Mitchell*, Justice Stewart concluded that a suit against the union for breach of the duty of fair representation should be subject to the six month limitation period found in § 10(b) of the NLRA. That very argument was adopted by the majority in *DelCostello*.

**9.** Our application of *DelCostello* in *Murray v. Branch Motor Express Co.*, 723 F.2d 1146 (4th Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 292, 83 L.Ed.2d 228 (1984) did not involve a similar claim of delay in raising a limitations defense. Similarly, in *Zemonick v. Consolidation Coal Co.*, No. 84-1353 (4th Cir. argued 10/3/84), no question of waiver was raised. Thus, in those cases, we had no occasion to consider the waiver argument pressed by Peterson.

**10.** Since ALPA's right to file an amended answer was triggered by the filing of an amended complaint, there was no occasion for the district court to rule on whether a motion pursuant to Federal Rule of Civil Procedure 15(a) to amend the answer should have been granted. Under

Rule 15(a) leave to amend pleadings should "be freely given when justice so requires." *See Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Had the district court ruled favorably on a motion by ALPA under Rule 15(a), our review would focus on whether there was an abuse of discretion. *See Lawson v. Truck Drivers, Local 100*, 698 F.2d 250, 256 (6th Cir.1983).

Nonetheless, we simply conclude that justice would not, in the particular non-assertion circumstances of the case, be served by allowing ALPA to raise a statute of limitations defense. The interests of justice are better served by giving Peterson the opportunity to press his claim rather than by allowing ALPA to take advantage of a technical defense which was never anticipated by either party. The oversight lies equally at the door of each of them, and one should not be allowed the advantage, as between them.

**11.** The federal labor policy favoring prompt resolution of disputes is somewhat attenuated in the present case. Peterson no longer works for Piedmont and has not sought reinstatement. Similarly, the nationwide strike that forms the backdrop of the case has long been settled, and ALPA's conduct here was not in pursuit of a collective bargaining agreement, nor was ALPA responding to Piedmont's breach of the collective contract.

them." *Order of Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). At the time Peterson filed his claim ALPA cannot claim it was surprised or prejudiced by a stale claim. Indeed for three years ALPA presumed the action was filed timely and engaged in extensive discovery. Thus, the purpose served by limitation periods—to allow an adversary repose—would not be furthered by allowing ALPA to raise the defense at the eleventh hour. *See Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965) (The "policy of repose designed to protect defendants is frequently outweighed ... when the interests of justice require vindication of the plaintiff's rights").[12]

This, in short, is not the case of a delinquent plaintiff whose counsel alone deserved smearing with pitch for delay in filing suit. Rather the attorneys for both plaintiff and defendant were, to the extent that pitch should be applied at all, tarred with the same brush. The uniformity and promptness decreed by *DelCostello* in instituting unfair representation cases will not seriously be frustrated by allowing an odd case to proceed where, if counsel for the plaintiff nodded, the defendant's lawyer slumbered to no less a degree. In the case of the initial complaint the plaintiff had already successfully negotiated the limitations hurdle, only to fall afoul of a rule permitting a limitations defense, which had not earlier been raised, to be introduced only because a subsequent amended complaint, no different as to the operative language of the count here involved, was filed. The portions of the original complaint with which we are concerned, the allegations of breach of a duty of fair representation, were not deemed by the district judge to be inadequate or defective. The rule allowing a limitations plea not made to an original complaint to be made to an amendment properly has no application to a claim whose nature has not been substantially affected by the amendment.[13]

Because both the plaintiff and the defendant assumed that a limitations period of at least one year governed the action we are unwilling to ratify a result of unwarranted harshness and will not cut off Peterson's right to have a full hearing on the allegations contained in his complaint, which, on its face, at least, has substantial merit.[14] Accordingly we reverse the holding that the action was time-barred.

### III

Having reinstated Peterson's federal claim, we must decide whether, if he ultimately prevails on the merits, punitive damages may be assessed against ALPA. Previously, in *Harrison v. United Transportation Union*, 530 F.2d 558, 563 (4th

---

**12.** A case presenting an answer to a complaint where the limitations defense was altogether apparent, well established at law but simply overlooked when the defendant first pleaded to the original complaint, stands on a rather different footing. In that instance, it may justly be said that, assuming the limitations defense can ultimately be made out, the case should never have been brought. Such is not the case here where, until *DelCostello* came down, the *general* view was that longer time bars under analogous state statutes controlled. *See Howard v. Aluminum Workers International*, 589 F.2d 771 (4th Cir.1978). Nor is this a case where the statute of limitations may be said to be jurisdictional. *See KSLA–TV Inc. v. Radio Corp. of America*, 732 F.2d 441 (5th Cir.1984). Here counsel for the plaintiff and defendants equally had, if not every reason, at least substantial reason to believe suit was timely and, hence, immune from a defense of limitations.

**13.** *See United States v. Mechanik*, 735 F.2d 136, 140 (4th Cir.1984), where a superseding indictment deemed defective was held, in effect, to have revivified those portions of the original indictment not suffering the malaise infecting the superseding indictment.

**14.** We appreciate that a defense on the merits may, of course, ultimately prevail when all the disputes of fact have been resolved, and we express no view as to which party should ultimately prevail. Although presented with motions for summary judgment, the district court went off on purely procedural grounds, never reaching the merits. We express no view on whether summary judgment on the merits would be appropriate. We only insist that the plaintiff should be permitted onto the judicial playing field.

Cir.1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976), we held that punitive damages were available if the union acted wantonly, maliciously, or in reckless disregard of an employee's rights. *Harrison,* however, was effectively overruled by *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979). In that case the Supreme Court held that punitive "damages may not be assessed against a union that breaches its duty of fair representation by failing properly to pursue a grievance." *Id.* at 52, 99 S.Ct. at 2128. Peterson argues that the holding in *Foust* should be limited to the grievance and arbitration context and, that, in any event, punitive damages should be available where the union acting intentionally and maliciously procures the discharge of an employee because of his prior refusal to honor a strike. We are satisfied, however, that in *Foust* the Supreme Court has established a *per se* rule prohibiting punitive damages in all duty of fair representation actions.

*Foust* involved punitive damages levied against a union which had mishandled an employee's grievance by filing it two days after the dead-line specified in the collective bargaining agreement. Distinguishable is the present appeal, in which Peterson alleged that he was the victim of a nation-wide conspiracy to retaliate against pilots who flew during an ALPA sponsored strike. Despite the difference, a close reading of *Foust* demonstrates that the ban on punitive damages is not limited to the arbitration and grievance context but applies to all fair representation actions.

The issue presented in *Foust* was "what if any circumstances justify assessing punitive damages against a union that breaches its duty of fair representation." 442 U.S. at 46, 99 S.Ct. at 2124. One circumstance squarely presented but not relied upon by the majority was the absence of any proof of union animus against the employee. Justice Blackmun noted in his concurrence that, "[t]he union's conduct here betrayed nothing more than negligence, and thus presented an inappropriate occasion for awarding punitive damages under any formula." *Id.* at 53, 99 S.Ct. at 2128 (Blackmun, J., concurring). Justice Marshall, writing for the majority, eschewed that narrower ground, however, and assumed that the jury had before it an instance where the union acted maliciously.[15] More importantly the majority took no exception to Justice Blackmun's statement, joined by three other members, that "[t]he Court now adopts a *per se* rule that a union's breach of the duty of fair representation can never render it liable for punitive damages, no matter how egregious its breach may be." *Id.* at 52–53, 99 S.Ct. at 2128. The absence of any rebuttal to the *per se* charge, coupled with the majority's rather obvious reaching out to avoid a more narrow basis for its decision, demonstrates that *Foust* created a barrier protecting the union against punitive damage awards in all fair representation actions. The circuit courts which have considered the issue are in accord. *See Quinn v. DiGuilian,* 739 F.2d 637, 647 (D.C.Cir.1984); *Wells v. Southern Airways, Inc.,* 616 F.2d 107, 109 n. 1 (5th Cir.1980); *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 78 (1980) (dicta); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1216 (8th Cir.1981),

---

**15.** Justice Marshall made clear that his holding applied to intentional and malicious union conduct. Responding to Justice Blackmun the majority wrote:

The court below further determined that the jury instructions comported with this legal standard. The District Court had charged the jury that it could award punitive damages if petitioners acted "maliciously, or wantonly, or oppressively."

Mr. Justice Blackmun surmises that "as a matter of law," the union's conduct "betrayed

nothing more than negligence." *Post,* at 53 [99 S.Ct. at 2128]. This conclusion necessarily assumes that there was insufficient evidence of malicious, wanton, or oppressive conduct to justify the jury's punitive damages award. We, however, are unwilling to substitute our judgment for that of the jury, District Court, and Court of Appeals on this essentially evidentiary question.

442 U.S. at 46 n. 7, 99 S.Ct. at 2124 n. 7.

*cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981) (dicta).[16]

## IV

In another "variant of a familiar theme" *Local 926, International Union of Operating Engineers v. Jones,* 460 U.S. 669, 675, 103 S.Ct. 1453, 1458, 75 L.Ed.2d 368 (1983), *quoting San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 239, 79 S.Ct. 773, 776, 3 L.Ed.2d 775 (1959), we must determine whether Peterson's pendent state law causes of action against ALPA and union members for civil conspiracy, unlawful blacklisting, and interference with a contractual relationship are preempted by his federal duty of fair representation claim.

■ The preemption doctrine, more familiar terrain under the National Labor Relations Act, 29 U.S.C. §§ 151–169 (1982), has been affected by two competing concerns. *See Farmer v. United Brotherhood of Carpenters & Joiners,* 430 U.S. 290, 295, 97 S.Ct. 1056, 1060, 51 L.Ed.2d 338 (1977). In the first place, preemption of state law is required in order to protect the primary jurisdiction of the administrative agency created by Congress to oversee the development of uniform rules of law governing labor-management relations. *See Vaca v. Sipes,* 386 U.S. 171, 178–79, 87 S.Ct. 903, 910–11, 17 L.Ed.2d 842 (1967). Thus, state (and federal) courts generally may not adjudicate claims based on conduct that is protected or prohibited by federal labor law, or arguably so. *San Diego Building Trades Council v. Garmon,* 359 U.S. at 244–45, 79 S.Ct. at 779–80. *Cf. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 375–77, 89 S.Ct. 1109, 1113–14, 22 L.Ed.2d 344 (1969). On the other hand, the Supreme Court has been unwilling to "declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions...." *Amalgamated Association of Street, Electric Railway & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 289, 91 S.Ct. 1909, 1919, 29 L.Ed.2d 473 (1971). Consequently, where the conduct sought to be regulated by state law is only a "peripheral concern" of federal labor law or touches interests "deeply rooted in local feeling and responsibility" we are instructed that the preemption inquiry requires a sensitive balancing of the potential harm to the federal scheme against the importance of the state's interest in protecting its citizens. *Farmer,* 430 U.S. at 296–97, 97 S.Ct. at 1061–62.[17]

Preemption under the RLA has followed a similar tack, but a more stringent pattern

---

**16.** The policy considerations articulated in *Foust* lend further support to our reading. In *Foust* the Supreme Court analyzed "[w]hether awarding punitive damages would comport with ... national labor policy," 442 U.S. at 48, 99 S.Ct. at 2125, and stated that "the overarching legislative goal" of the RLA is to "facilitate collective bargaining and to achieve industrial peace," and not to punish. The Court concluded that punitive damage awards against a union would not advance national labor policies, even where the union's conduct was malicious. Admittedly several arguments in support of that conclusion are germane only where the union does not fairly pursue employee grievances. The threat that punitive damages might impinge on union discretion in handling grievances and force unions to pursue frivolous claims or resist fair settlements, for example, seems to have little significance where it is alleged that the union maliciously sought to force the discharge of an employee who exercised his right not to honor a strike. Undoubtedly imposing punitive damages in the present context would be a powerful incentive for the unions to act fairly. Offsetting potential benefits, however, "is the possibility that punitive awards could impair the financial stability of unions and unsettle the careful balance of individual and collective interests which [the Supreme Court had] previously articulated in the unfair representation area." *Id.*

**17.** Under the "local interest" exception to the preemption doctrine, the Supreme Court has authorized state law causes of action for the tort of intentional infliction of emotional distress, *Farmer v. United Brotherhood of Carpenters and Joiners of America,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), trespass, *Sears Roebuck & Co. v. Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), malicious libel; *Linn v. United Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), and mass picketing and violence, *Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958).

of judicial deference has emerged. The scheme of remedies and procedures carefully crafted in the RLA has long been interpreted as evidence of congressional intent significantly to limit an aggrieved employee's right to resort to state law as an alternative remedy for a wrongful discharge. *See Andrews v. Louisville & Nashville Railroad Co.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). Garden variety wrongful discharge actions, so-called "minor disputes" involving rights under the collective bargaining agreement, ordinarily are subject to the mandatory arbitration procedure provided in 45 U.S.C. § 153 First (i) and are routinely held to be within the exclusive jurisdiction of the arbitral authority created by the statute. *See Andrews v. Louisville & Nashville Railroad Co.*, 406 U.S. at 324–25, 92 S.Ct. at 1565–66. As the Supreme Court explained in *Union Pacific Railroad v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) "Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts." *See also Air Line Pilots Association v. Texas International Airlines*, 656 F.2d 16, 19 (2d Cir.1981). Unlike preemption under the NLRA, the preemption of state law claims under the RLA has been more complete. *See, e.g., Minehart v. Louisville & Nashville Railroad Co.*, 731 F.2d 342 (6th Cir.1984); *Jackson v. Consolidated Rail Corp.*, 717 F.2d 1045 (7th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984); *Beers v. Southern Pacific Transportation Co.*, 703 F.2d 425 (9th Cir.1983); *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367 (9th Cir.1978), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Majors v. U.S. Air, Inc.*, 525 F.Supp. 853 (D.Md. 1981).[18] Consequently, in approaching the preemption question we are mindful that Peterson's right to resort to state law to vindicate his wrongful discharge claim has

been circumscribed in the first instance by the RLA.

Peterson's duty of fair representation claim now proceeding only against ALPA is, of course, not itself preempted by the arbitration machinery mandated by the RLA. *See Czosek v. O'Mara*, 397 U.S. 25, 27–28, 90 S.Ct. 770, 772–73, 25 L.Ed.2d 21 (1970) (the claim against the union for breach of the duty of fair representation is a discrete claim from the right of an individual to pursue his grievance under the RLA). *Cf. Vaca v. Sipes*, 386 U.S. at 180–81, 87 S.Ct. at 911–12. Since Peterson has alleged that his discharge by Piedmont was the product of unlawful union discrimination, his only remedy is to sue ALPA in state or federal court. *Id.* Consequently, there is no question that federal jurisdiction over Peterson's entire complaint was proper. Instead, the preemption inquiry in the present case is whether the duty of fair representation claim itself "preempts" the power of the district court to exercise its pendent jurisdiction over related state law claims. To resolve the question, we refer to NLRA cases since we believe the risk of state interference with the effective administration of national labor policy is present here even though the exclusive jurisdiction of the arbitrator is not at issue.

▮ At the outset we note that the allegations contained in Peterson's complaint can hardly be called a peripheral concern to federal labor law. *Compare Linn v. United Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The duty of fair representation is a corollary of the union's status as the exclusive representative of all employees in a bargaining unit. *See International Brotherhood of Electrical Workers v. Foust*, 442 U.S. at 46–47, 99 S.Ct. at 2124–25; *Vaca v. Sipes*, 386 U.S. at 182, 87 S.Ct. at 912. When the union has abused its power, the duty of fair representation stands as "a bulwark to prevent arbitrary union conduct...." *Vaca v. Sipes*, 386 U.S. at 182,

---

18. The legislature's intent to preempt wrongful discharge actions is plain from the statute itself. The RLA has made "any grievance" arising out of the collective bargaining agreement subject to exclusive arbitral remedies. *See* 45 U.S.C. § 153 First (i) (1982). In contrast the NLRA is limited to specific conduct subject to either protection or prohibition by 29 U.S.C. §§ 157–158 (1982).

87 S.Ct. at 912. The importance of the federal interest is such that the duty of fair representation cause of action is governed exclusively by federal law even when the claim is filed in state court. *Id.* at 178, 87 S.Ct. at 910.

■ A careful examination of Peterson's complaint also demonstrates that the underlying dispute draws its basic character from ALPA's alleged violation of federal law, and that the state law claims, in both substance and relief, are identical to the federal claim. The only losses Peterson has sustained were caused by his wrongful discharge. Under federal law Peterson may recover all of his damages if he can prove they were attributable to the union's misconduct. *See Czosek v. O'Mara,* 397 U.S. at 28–29, 90 S.Ct. at 773; *Vaca v. Sipes,* 386 U.S. at 197–98, 87 S.Ct. at 920–21. The causes of action for conspiracy, interference with a contractual relation, and unlawful blacklisting add nothing by way of relief. Peterson does not seek compensation for any injury beyond that which would be awarded if successful on the duty of fair representation claim.[19]

More importantly, Peterson's state law claims not only focus on conduct prohibited by federal law, the state claims are essentially identical to the duty of fair representation claim. The district court found that Peterson had no written employment contract and, as an "at will" employee under

North Carolina law, *Nantz v. Employment Security Commission,* 290 N.C. 473, 226 S.E.2d 340 (1976); *Brooks v. Carolina Telephone & Telegraph Co.,* 56 N.C.App. 801, 290 S.E.2d 370 (1982), was protected only by the terms of the collective bargaining agreement and by any rights he might have under the RLA. To recover under either the state or federal claims Peterson must prove that Piedmont's discharge violated the collective bargaining agreement and that the union caused his discharge, which would be a violation of its duty of fair representation, a violation of the Wien Air settlement agreement and, by sponsoring a slowdown of flight operations, a violation of obligations under the collective bargaining agreement with Piedmont. In short, if Peterson can recover on his state law claims, it will be because he has established a violation of federal law. In addition, although the state's interest in protecting Peterson is not insignificant, the interpretation of collective bargaining agreements and the range of economic self-help under the RLA available to the union are matters which must be determined by federal law. *See Brotherhood of Railroad Trainmen v. Jacksonville Railroad Terminal,* 394 U.S. at 377–82, 89 S.Ct. at 1114–17.[20]

In light of the significant overlap of the state and federal claims, it becomes apparent that Peterson seeks to pursue the state

---

**19.** Peterson's reliance on the "outrageous conduct" exception to preemption. *Farmer v. Brotherhood of Carpenters & Joiners,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), is thus misplaced. In *Farmer* the Court held that a California state court could exercise jurisdiction over a tort action brought by a local union officer against his union for intentional infliction of emotional distress. In analyzing whether preemption was required, the Court noted that the state had a substantial interest in protecting its citizens from alleged outrageous conduct. *Id.* at 302, 97 S.Ct. at 1064. The Court also noted that the potential conflict with the federal scheme was minimal because the state claims focused on "the abusive manner in which the discrimination [was] accomplished or threatened rather than a function of the actual or threatened discrimination." 430 U.S. at 305, 97 S.Ct. at 1066. The Court emphasized, however, that a union's violation of the NLRA could not form the basis of outrageous conduct for a state tort action. Here, even a cursory reading

of Peterson's complaint demonstrates that, unlike the situation in *Farmer,* his injury was purely a function of unlawful job discrimination, and that the overlap between his state and federal claims is substantial.

Peterson's complaint instead is akin to *Amalgamated Association of Motor Coach Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), where the Supreme Court held that the preemption doctrine barred a state breach of contract claim against a union for procuring the discharge of an employee. In *Lockridge* the Court in *dicta* criticized the view that jurisdiction over a breach of contract claim was proper because in essence the action vindicated the same rights as a duty of fair representation claim. *Id.* at 298–301, 91 S.Ct. at 1923–1925.

**20.** Cases such as *Linn v. United Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), which involved malicious libel, pro-

claims merely to take advantage of more liberal remedies. Since Peterson's state claims seek to vindicate rights largely secured by federal law, the potential conflict between remedies and administration are too great to permit the state claims to stand. *See In re Sewell,* 690 F.2d 403, 409 (4th Cir.1982).

Accordingly, we reverse the dismissal on limitations grounds of the federal duty of fair representation claim and affirm the dismissal of the punitive damage claim and the common law claims.

AFFIRMED IN PART and REVERSED IN PART.

vide little support for Peterson's position. *Linn* involved a traditional common law tort which can truly be said to be but of peripheral concern to labor law. 383 U.S. at 61, 86 S.Ct. at 662.

Here, ALPA's conduct and possible defenses raise questions of federal law, which would have to be resolved in order to rule on the state claims.