**NORFOLK AND WESTERN RAILWAY COMPANY, Plaintiff,**

v.

**Jerry J. DANIELS, et al., Defendants.**

No. 98–0070–A.

United States District Court, W.D. Virginia, Abingdon Division.

March 2, 1999.

**358**

## OPINION

Sara Bugbee Winn, William B. Poff, Woods, Rogers & Hazelgrove, Roanoke, VA, James S. Whitehead, Sidley & Austin, Chicago, IL, for Plaintiff.

Gregory Michael Tobin, David A. Hylla, Robert B. Ramsey, William J. Billeaud, Pratt, Bradford & Tobin, P.C., East Alton, IL, for Defendants.

JONES, District Judge.

The principal questions in this case are whether the Railway Labor Act preempts a state cause of action by FELA attorneys to enjoin a railroad's disciplinary hearings and whether the attorneys should be enjoined from so interfering with the hearings. I find that the state cause of action is preempted and that injunctive relief should be granted.

### I. Facts.

### A. Background.

The plaintiff, Norfolk Southern Railway Company ("NS"),[1] headquartered in Virginia, filed this action pursuant to the court's federal subject matter jurisdiction, seeking declaratory and injunctive relief under federal law, as well as under state law, based on supplemental jurisdiction. The defen-

dant Jerry J. Daniels, a Virginia resident, is a former employee of NS, who allegedly suffered a work-related accident in Virginia. The defendant Pratt & Tobin, P.C. ("Pratt") is a professional corporation engaged in the practice of law, with offices in Illinois.

Pratt represents Daniels and many other railroad workers who are asserting claims under the Federal Employers Liability Act ("FELA"), 45 U.S.C.A. §§ 51–60 (West 1986). In its complaint, NS alleged that Pratt was about to seek injunctive relief from an Illinois state court, as it had done in other similar cases, preventing NS from conducing a disciplinary hearing concerning Daniels' accident, as provided for in a collective bargaining agreement between NS and Daniels' union. Among other grounds, NS contended that Pratt's contemplated action would violate NS's rights under the provisions of the Railway Labor Act ("RLA"), 45 U.S.C.A. §§ 151–163 (West 1986).

After the filing of the complaint, this court entered a temporary restraining order against the defendants, preserving the status quo. A temporary injunction was thereafter entered and a bench trial on the merits was held on December 15, 1998. This opinion sets forth the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).[2]

### B. Findings of Fact.

1. NS brings this action for a declaration of its rights and for injunctive relief under the RLA and under Illinois state law. NS seeks declaratory relief against Pratt pursuant to 28 U.S.C.A. § 2201(a) (West 1994) and Fed.R.Civ.P. 57 on the ground that this case involves a case of actual controversy between the parties

---

1. After suit was filed, the original plaintiff, Norfolk and Western Railway Company, was merged into its parent corporation, Norfolk Southern Railway Company, and ceased its separate corporate existence. Accordingly, NS will be substituted as the plaintiff and hereafter NS will be referred to as the plaintiff.

2. Following the trial, I permitted the defendants to submit additional portions of deposition testimony, subject to the plaintiff's objection. The plaintiff did object to certain portions of the designated testimony, but I will overrule the objection. I find, however, that the disputed deposition testimony is not determinative to my decisions.

falling within the court's jurisdiction. NS also seeks permanent injunctive relief against future conduct by Pratt.[3]

2. NS, a Virginia corporation, is, and at all times relevant hereto has been, a "carrier" within the meaning of the RLA, 45 U.S.C.A. § 151 First. NS's corporate headquarters is located in Norfolk, Virginia.

3. Jerry J. Daniels was, until November 24, 1998, an "employee" of NS within the meaning of the RLA, 45 U.S.C.A. § 151 Fifth. Daniels resides in Pounding Mills, Virginia, and had been employed by NS for more than twenty years.

4. While he was employed by NS Daniels fell within the craft or class of maintenance of way employees in NS's maintenance department. The terms and conditions of Daniels' employment by NS were prescribed in and governed by a collective bargaining agreement ("CBA") dated July 1, 1986, between NS and the Brotherhood of Maintenance of Way Employees ("BMWE"), his "representative" within the meaning of the RLA, 45 U.S.C.A. § 151 Sixth.

5. Other employees of NS fall within other crafts or classes and are represented by other labor unions. The terms and conditions of these employees' employment with NS are prescribed in and governed by collective bargaining agreements ("CBAs") negotiated between NS and those unions.

6. The CBAs between NS and the various representatives of its employees prescribe the procedures that NS must follow before it may impose discipline on an employee suspected of having engaged in misconduct.

7. NS has established both safety and operating rules and has issued these rules to its employees. These rules prescribe how employees are to conduct themselves while at work. Employees are expected to know and to follow these rules. They attend rules classes and are given tests to establish their knowledge of the rules. Both the safety and operating rules are intended to guide employees on safe work practices in order to prevent them from becoming injured. The rules are intended to prescribe a uniform way in which the railroad will operate in order to result in safe and efficient rail operations.

8. Daniels was bound by and expected to follow the NS safety and operating rules.

9. NS has a legitimate business interest in having its employees comply with its safety and operating rules.

10. Employees who violate NS's safety and operating rules are subject to discipline by the carrier. Employees may also be disciplined for conduct not specifically addressed in the rules but is, in the judgment of the carrier, unbecoming of an NS employee.

11. NS has a legitimate business interest in investigating the facts concerning alleged employee misconduct before making a decision whether to impose any discipline.

12. NS has a legitimate business interest in disciplining employees who have engaged in misconduct, including violations of carrier rules.

---

3. NS no longer seeks any relief against Daniels because the disciplinary investigation concerning possible misconduct by Daniels has been completed and Daniels has been dismissed from NS employment. The facts concerning Daniels continue to have relevance here, however, because Pratt's assertion that its rights would be violated as a result of NS's discipline of Daniels is characteristic of the ongoing dispute between these parties. The remaining claim against Pratt is not moot since the same conduct is likely to reoccur. *See City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 n. 10, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'") (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)).

13. The CBA sets forth the procedure that NS must follow in connection with the discipline of an employee in the maintenance of way craft, such as Daniels. The rights and obligations of NS, BMWE, and the employee are prescribed in Rule 30 of the CBA ("Discipline and Grievances"). The CBAs between NS and other unions contain similar disciplinary procedures.

14. Rule 30(a) provides, in relevant part:

> An employee who has been in service more than sixty (60) calendar days shall not be disciplined or dismissed without a fair and impartial investigation, at which investigation he may be assisted by duly authorized representatives. He may, however, be held out of service, except for minor offenses, pending such investigation.

> The employee will be given not less than ten (10) days' advance notice, in writing, of the date of the investigation which shall set forth the precise charge against him with a copy to the general chairman. The investigation shall be held within 30 days of first knowledge of the offense. At the request of either party the investigation will be postponed; however, such investigation will not be postponed in excess of ten (10) calendar days beyond the date first set except by mutual agreement.

> A written transcript of statements taken at the investigation will be made, and a copy furnished to the duly authorized representative at the time the decision is rendered. Decision will be rendered in writing to the employee and his representative within twenty (20) days after completion of the investigation unless an extension of time is agreed upon.

15. Rule 30(b) of the CBA specifically states that the employee's "duly authorized representative," by whom he may be represented at the disciplinary investigation,[4] "shall be understood to mean a member of the regularly constituted committee or an officer of the organization duly authorized to represent the employee in accordance with the Railway Labor Act, as amended."

16. NS interprets Rule 30(b) of the CBA as allowing an employee who is charged with a disciplinary offense to be represented at the disciplinary investigation by a representative of the BMWE. NS does not interpret Rule 30(b) or any other provision in the CBA as granting such employee the right to be represented at a disciplinary investigation by his or her private attorney. Daniels and Pratt deny that NS has correctly interpreted Rule 30(b) of the CBA in this respect.

17. NS attorneys are not present at the disciplinary hearings.

18. The purpose for holding a disciplinary hearing is to develop the facts that are involved in the incident in question and to ensure that the employee under investigation has the opportunity to bring out any facts or information that he thinks ought to be considered.

19. After the disciplinary hearing has been held, NS managerial officials make a determination whether the employee is guilty of misconduct deserving of discipline and determine the nature and extent of any discipline to be imposed.

20. In some instances, the carrier will determine that the employee has not engaged in any misconduct or that the employee's conduct does not warrant any discipline.

21. Alternatively, the carrier may give the employee a letter of reprimand.

---

**4.** As used herein, the terms "[disciplinary] investigation" and "[disciplinary] hearing" are synonymous. Rule 30(a) uses the term "investigation" but in practice the investigation takes the form of a hearing at which an NS manager presides and evidence is presented. Other CBAs between NS and different unions refer more directly to the proceeding as a "hearing." *See* Pl.'s Ex. 4, Dec. 15, 1998.

22. The carrier may impose either a deferred or actual suspension from work without pay on the employee.

23. In some instances, the carrier will dismiss the employee as a result of the misconduct the carrier finds the employee has committed.

24. An employee who disagrees with the discipline he has been given has a right under the CBA to appeal the discipline to higher NS officials. If he is still not satisfied with the result, he may have the dispute resolved through neutral arbitration by either an appropriate division of the National Railroad Adjustment Board ("NRAB") pursuant to the RLA, 45 U.S.C.A. § 153 First(i), or a private arbitration board established by the carrier and the employee's representative under the RLA, 45 U.S.C.A. § 153 Second. The RLA arbitration tribunal will issue a decision that is final and binding on all parties. 45 U.S.C.A. § 153 First(m). Arbitrators have the authority to set aside carrier discipline, to order a carrier to reinstate a dismissed employee, and to order the carrier to make the disciplined employee whole for any economic losses he may have suffered.

25. Daniels alleges that on April 24, 1997, he injured his back throwing a switch while on duty with NS in Virginia. He did not inform any NS official that day that he had hurt his back as a result of work activities.

26. On or about April 29, 1997, Daniels marked off work on account of illness. Daniels never returned to active service after that date. When he told his supervisors on April 29 that he would need to be absent from work, he did not tell them that his injury was work-related. His supervisors asked him whether the injury was work-related, and Daniels said that it was not. During the subsequent period of his absence, Daniels spoke with his supervisor, Track Supervisor G.E. Carlyle, several times. In none of those conversations did he ever indicate that the injury he had suffered was work-related.

27. At some date subsequent to April 28, 1997, Daniels retained Pratt to represent him as his attorney and agent in connection with a personal injury claim against NS under FELA based on his alleged accident of April 24, 1997, in Virginia. Pratt, purporting to act as Daniels' attorney and agent, sent NS a notice of attorneys' lien dated January 13, 1998. To date, no FELA lawsuit has been filed against NS by the Pratt firm on behalf of Daniels. Daniels retained Pratt solely to represent him on his FELA claim.

28. Daniels did not tell NS that he had sustained an injury on the job prior to Pratt's sending of the attorneys' lien letter dated January 13, 1998.

29. Daniels chose the Pratt firm because he was afraid the railroad would fire him and he thought Pratt could save him from being discharged. He chose Pratt in order to try to stop the railroad from investigating his injury and possibly disciplining him.

30. Pratt represents railroad employees, such as Daniels, strictly on a contingent fee basis, receiving twenty-five percent of any settlement or judgment obtained as a result of the firm's services.

31. Daniels' supervisors learned for the first time when they received Pratt's lien letter in January 1998 that Daniels was making a claim that his absence from work was due to an injury he allegedly sustained while at work for NS.

32. Rule 1000 of the NS General Safety Rules states:

An employee who sustains a personal injury while on duty or on Company property or equipment must report it, before leaving Company premises, to his immediate supervisor, to the employee in charge of the work, or to proper authority, who will promptly report the facts through channels.... If an employee at any time marks off or obtains medical attention for an on-duty injury

or occupational illness, he must promptly notify his supervisor.

33. The rules of NS also prohibit any employee from providing false or misleading information about an on-duty accident or injury or about any other job-related matter.

34. NS General Rule N states:

Every accident resulting in injury, death or damage to property must be reported to the proper authority by the quickest communication available, and a written report on the prescribed form must be submitted promptly. The report must include the name and address of each injured person and describe the extent of the injury. Names and addresses of all persons at the scene are required, whether or not they admit knowledge of the accident.

35. Daniels was familiar with Rule 1000 at the time of his alleged injury and knew that he had an obligation to report his injury in accordance with the rule. He did not do so and has admitted that he violated the rule. Daniels was also familiar with General Rule N at the time of his alleged injury. He knew that he had an obligation under the rule to report his injury. Daniels has admitted that he violated General Rule N as well.

36. Because it did not appear to NS officials that Daniels had reported the occurrence that allegedly resulted in his injury to his supervisors in a timely fashion, as required by NS Safety Rule 1000 and General Rule N, it was decided that Daniels would be notified to appear at a disciplinary hearing pursuant to Rule 30 of the CBA in order to permit NS to determine whether a violation of its rules had occurred and, if so, to decide what level of discipline would be appropriate. Daniels has admitted that it was reasonable for NS to suspect that he may have violated these NS rules.

37. By letter dated January 29, 1998, NS Track Supervisor G.E. Carlyle notified Daniels that he was to attend a formal investigation into this matter on February 13, 1998. A copy of the letter was sent to the BMWE's General Chairman T.R. McCoy. The investigation was subsequently postponed to March 13, 1998, and then to April 9, 1998.

38. Track Supervisor Carlyle's sole purpose in summoning Daniels to the hearing was to determine the facts concerning Daniels' apparent failure to report his personal injury to NS in a timely fashion as required by the carrier's rules. It was Track Supervisor Carlyle's intent to develop a complete factual record on these issues so that NS could determine whether Daniels had, in fact, violated NS Rule 1000, or any other applicable rule, whether it would be appropriate to impose discipline on Daniels for his conduct as so found, and, if so, the nature and extent of such discipline. The disciplinary hearing would be conducted pursuant to and in accordance with the rights and obligations of NS and Daniels as specified in Rule 30 of the CBA.

39. Track Supervisor Carlyle did not summon Daniels to the investigation with either the intent or purpose of interfering in any way with Daniels' relationship with Pratt or with Daniels' FELA claim.

40. After receiving the January 29, 1998, notice from Track Supervisor Carlyle, Daniels informed Pratt that he had been summoned to attend a disciplinary investigation hearing by NS. Daniels told a Pratt attorney that he would rather not go to the investigation, if possible. Daniels asked Pratt to seek an injunction against the railroad to stop the investigation.

41. At some time before February 13, 1998, Gregory Tobin, the sole owner of the Pratt firm, informed Thomas Alvey, an attorney who represents NS in certain personal injury matters in southern Illinois, that, unless NS agreed not to hold the hearing concerning Daniels, Pratt would file suit against NS in Illinois state court in the law firm's own name seeking to enjoin NS from proceeding with the

disciplinary investigation of Daniels in order to uphold and protect Daniels' rights.

42. By letter dated April 8, 1998, NS Track Supervisor G.E. Carlyle informed Daniels that the formal investigation based on the January 29, 1998, notice was canceled.

43. On April 27, 1998, NS Track Supervisor Carlyle sent Daniels a new letter summoning him to a disciplinary hearing on May 8, 1998.

44. On April 28, 1998, NS filed its complaint in this court. On April 28, 1998, this court entered a temporary restraining order enjoining Daniels and Pratt from attempting in any way to interfere with or delay the disciplinary investigation hearing scheduled for May 8, 1998.

45. The only reason Pratt did not file suit against NS in Illinois in the law firm's name seeking to block NS from proceeding with the disciplinary hearing for Daniels was because NS filed this action in this court first and because of the restraining order issued by this court.

46. On May 1, 1998, after having been served with a copy of NS's complaint and the court's temporary restraining order, Pratt sent a letter to counsel for NS stating:

> This is to confirm that our office will not seek injunctive relief with regard to the investigation scheduled. This should render this matter moot. I think it would be unnecessary for a Judge to enter an order prohibiting this firm from obtaining injunctive relief when we have indicated and agreed that we will not seek injunctive relief to stop the investigation regarding Jerry Daniels.

47. The Daniels hearing was subsequently rescheduled on more than one occasion and ultimately was held on November 19, 1998. Daniels declined to appear. The hearing was conducted in his absence.

48. Based on the evidence presented at the November 19, 1998, hearing, NS determined that Daniels was guilty of having violated its rules. On November 24, 1998, NS sent Daniels a letter informing him:

> This refers to formal investigation held November 19, 1998, to determine your responsibility in connection with your failing to properly report an alleged on duty injury of April 24, 1997, and making false and conflicting statements concerning alleged on duty injury of April 24, 1997.
>
> Based on the facts brought out in this formal investigation, you are hereby dismissed from all services of the Norfolk Southern Corporation and its subsidiaries.

49. Daniels continues to be represented by Pratt with respect to his personal injury claims against NS. He has not terminated his relationship with Pratt as a result of his dismissal by NS.

50. Pratt has represented, currently represents, and likely in the future will represent, numerous NS employees in connection with personal injury claims and FELA lawsuits against NS. Pratt has represented approximately 1,200 NS employees for hearing loss claims and hundreds of other NS employees with other types of personal injury claims.

51. On sixteen prior occasions Pratt has filed lawsuits against NS in its own name seeking to enjoin NS from conducting disciplinary proceedings against a particular Pratt client. In each case, Pratt appeared before an Illinois state court judge ex parte without giving NS any prior notice and obtained a temporary restraining order that enjoined NS from proceeding with its scheduled disciplinary investigation.

52. In these prior suits, Pratt alleged that it was entitled to an injunction in its own name against NS disciplinary proceedings concerning specifically identified clients because the conduct of such proceedings would tortiously interfere with Pratt's relationships with its clients, causing the law firm irreparable injury.

53. At no time has a Pratt client employed by NS ever terminated his or her relationship with Pratt as a result of being summoned to attend a disciplinary hearing scheduled under one of the CBAs.

54. In addition to the law suits Pratt has filed against NS, the law firm has also filed similar suits in the law firm's own name against other rail carriers. In each instance, the law firm has asserted that the rail carrier's conduct of disciplinary investigations concerning possible misconduct by a Pratt client has tortiously interfered with the law firm's relationship with that client. Several of these suits have been filed since the filing of the NS complaint in the instant case.

55. In each of these cases filed against NS and the other rail carriers, Pratt has asserted that the railroad's conduct in holding a disciplinary hearing of a Pratt client was unjustified.

56. It continues to be Pratt's position that NS's conduct of disciplinary proceedings concerning Pratt clients pursuant to the procedures prescribed in the railroad's CBAs will violate the law firm's rights by interfering with its relationships with its clients. Pratt has not agreed to forgo the assertion of such rights and, unless enjoined, will likely do so in the future.

57. Pratt has contended in prior law suits against NS that the exclusion of employees' attorneys from disciplinary investigations will violate Pratt's rights, and continues to make such a contention. In addition, Pratt believes it to be in its interest to delay any disciplinary investigation of a FELA claim by NS until after the conclusion of the FELA case in order to forestall NS's possible defense that the FELA claimant has no claim for future wage loss by virtue of a dismissal from service. NS has asserted such defenses in

past FELA cases and likely will in the future.

58. Because of the length of time over which individual FELA cases may be pending, and because of the close relationship between disciplinary matters and carrier safety, NS has a legitimate business reason in conducting a disciplinary investigation in an individual case prior to the resolution of any related FELA case. This is true even though employee accidents may be investigated by NS independently of a disciplinary hearing, since prompt employee discipline is a legitimate employer concern.

## II. Analysis.

### A. Federal Preemption.

The RLA, adopted in 1926, had as its purpose "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). In particular, the statute provides "for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions." 45 U.S.C.A. § 151a.

The federal preemption doctrine applies in those situations where Congress, by a statutory enactment, has either explicitly or implicitly, "superceded relevant state law that could undermine achievement of the goals of the federal statute." 15 James Wm. Moore, *Moore's Federal Practice* § 103.45[2] (Daniel R. Coquillette et al. eds., 3d ed.1998). It is established that the RLA preempts state causes of action which involve the interpretation or application of existing labor agreements. *See Hawaiian Airlines*, 512 U.S. at 256, 114 S.Ct. 2239.[5]

---

**5.** There is no question but that the cause of action which Pratt has previously asserted in the Illinois state courts against NS is the type of state law to which preemption may apply. *See Peterson v. Air Line Pilots Ass'n, Int'l*, 759

F.2d 1161, 1169 (4th Cir.1985) (holding that RLA preempted state cause of action for interference with a contractual relationship); *accord Pilkington v. United Airlines*, 112 F.3d 1532, 1540 (11th Cir.1997) (tortious interfer-

■ The defendant Pratt's state cause of action against NS is properly described as one for tortious interference with prospective economic advantage. *See Callis, Papa, Jensen, Jackstadt & Halloran, P.C. v. Norfolk Southern Corp.*, 292 Ill.App.3d 1003, 226 Ill.Dec. 967, 686 N.E.2d 750, 754 (1997). To be actionable, the interference must be both intentional and improper. *See Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 230 Ill.Dec. 229, 693 N.E.2d 358, 371 (1998); *Restatement (Second) of Torts* § 766B (1979).

■ The defendant Pratt argues that there is no preemption of its state cause of action and thus no subject matter jurisdiction in this court because the assertion of its claim against NS does not involve any interpretation of the CBA.[6] I disagree.

■ In the first place, the defendants have denied, in their pleadings in this case, that the CBA is properly interpreted to exclude lawyers from the investigation. Certainly NS takes that position, and Pratt has based its state injunction actions on this fact, contending that its economic expectancy will be harmed by its exclusion from its clients' hearings. Nevertheless, it does not agree with NS's interpretation of the CBA.

Moreover, even if the interpretation of the CBA was not in dispute, the application of the CBA is clearly involved in the state cause of action, since to prove its case, Pratt must show that the right given by the CBA to exclude employees' lawyers from disciplinary investigations is insufficient justification for NS's actions. Pratt's state cause of action, therefore, is not "independent of the CBA." *Hawaiian Airlines, Inc.*, 512 U.S. at 258, 114 S.Ct. 2239.

Accordingly, I find that the RLA preempts Pratt's state cause of action for tortious interference against NS and thus federal subject matter jurisdiction exists in this case.[7]

### B. Entitlement to Relief.

#### 1. Injunctive Relief.

Injunctive relief is governed by equitable principles. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–12, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). A movant must demonstrate irreparable harm, lack an adequate legal remedy, and the "balance of hardships" must favor the movant. *See* 13 James Wm. Moore, *supra*, § 65.06.

■ Under the facts in this case, NS has met these tests. It is likely that fu-

ence with a business relationship); *Fry v. Airline Pilots Ass'n, Int'l*, 88 F.3d 831, 838 (10th Cir.1996) (tortious interference with contract).

6. The defendants initially moved to dismiss the case for lack of subject matter jurisdiction and I reserved decision on the motion pending trial. Under the well-pleaded complaint rule, federal jurisdiction must be determined solely from the allegations of the complaint, unless federal preemption is complete under the legislation in question. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). The authorities are divided as to whether the RLA completely preempts state law, as is the case with the Labor Management Relations Act. *Compare Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R.R. Co.*, 858 F.2d 936, 942 (3d Cir.1988) (holding that RLA is not completely preemptive, in part because it contains no civil enforcement provisions), *with Deford v. Soo Line R.R. Co.*, 867 F.2d 1080,

1084–86 (8th Cir.1989) (holding that RLA constitutes complete preemption). The plaintiff NS asserted federal jurisdiction in its complaint, although a complaint seeking declaratory relief alone will not normally support federal jurisdiction where the federal lawsuit is filed to obtain a declaration of the merits of a defendant's prospective state court action in which no federal claim will be asserted. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 673, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). Here, however, NS also seeks injunctive relief.

7. NS asserts subject matter jurisdiction under both the general federal question statute, 28 U.S.C.A. § 1331 (West 1993), and a specific federal question statute, 28 U.S.C.A. § 1337(a) (West Supp.1998) (granting jurisdiction for claims arising under statutes regulating interstate commerce). However, the "arising under" language in the two statutes is interpreted the same. *See Hunter v. United Van Lines*, 746 F.2d 635, 639 (9th Cir.1984).

ture state court actions will be filed against NS and legal relief, even if available, could only be obtained by multiple actions. *See Lee v. Bickell,* 292 U.S. 415, 421, 54 S.Ct. 727, 78 L.Ed. 1337 (1934) ("[T]he multiplicity of actions necessary for redress at law being sufficient, without reference to other considerations, to uphold the remedy by injunction."). Similarly, NS's interest in preserving its disciplinary system without interference could not be adequately measured or compensated for in money damages, and thus without an injunction, NS likely will suffer irreparable harm. *See Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").

■ In considering the balancing of harm to the parties, I rely upon my finding that NS has an important and legitimate interest in conducting its disciplinary proceedings. While it is true that NS relies on any discharge as a defense to continued wage loss in FELA litigation, all disciplinary actions are subject to arbitration, allowing an impartial review of any management decision to suspend or discharge an employee.

Moreover, there is no evidence that NS has used the disciplinary process for improper purposes, such as delving into confidential attorney-client communications or attorney work-product, or, as importantly, in order to intimidate or discourage FELA claimants.

On the other hand, while doubtless an employee would benefit from legal representation at a disciplinary hearing, there is no generally recognized right to legal counsel in such matters. *See* Herbert L. Sherman, *The Role and Rights of the Individual in Labor Arbitration,* 15 Wm. Mitchell. L.Rev. 379, 419–426 (1989).

8. *See, e.g., Pratt, Bradford & Tobin, P.C. v. Norfolk & Western R.R. Co.,* 885 F.Supp. 1126 (S.D.Ill.1994) (holding that Pratt's injunction

While it would certainly be in Pratt's best economic interest to delay any disciplinary investigations of a FELA client until the FELA case is concluded, and thus minimize the possibility that the client's discipline might adversely affect the FELA claim, that interest is not overbalanced by the railroad's interest in a speedy determination of employee discipline, particularly where, as here, such determinations may involve important safety concerns.

■ The defendants contend that the plaintiff has unreasonably delayed bringing this action and thus its claim for injunctive relief is barred by the doctrine of laches. While Pratt represents that it has engaged in this conduct for at least seven years, it also agrees that NS has previously contested Pratt's right to do so.[8] Under the circumstances, it cannot be successfully contended that NS acquiesced in Pratt's conduct. Moreover, it is the repetitive nature of Pratt's interference with the disciplinary process that demonstrates that injunctive relief is necessary to prevent its recurrence.

Finally, there is no showing of any prejudice to Pratt resulting from any delay in bringing this action. *See Tobacco Workers Int'l Union, Local 317 v. Lorillard Corp.,* 448 F.2d 949, 958 (4th Cir.1971) (holding that to establish laches, the defendant must show that any prejudice was the result of plaintiff's delay).

### 2. Declaratory Relief.

■ The plaintiff has also made a sufficient case as to declaratory relief, at least in so far as the preemption of Pratt's state cause of action by the RLA. NS also requests declaratory relief as to Illinois law concerning Pratt's claim of tortious interference. However, I will exercise my discretion and decline to declare state law under the circumstances.

action must be remanded to state court under removal jurisdiction principles).

In particular, NS requests that I declare that its conduct of disciplinary hearings pursuant to the CBAs is privileged under Illinois law, so as to defeat any claim for tortious interference. It also requests that I declare that the disciplinary proceedings cannot violate Pratt's rights under Illinois law unless Pratt proves that NS's purpose was to terminate the attorney-client relationship and such result was likely to occur.

 Whether or not to grant declaratory relief is discretionary with the court. *See Wilton v. Seven Falls Co.,* 515 U.S. 277, 282–83, 286–87, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); *Aetna Cas. & Sur. Co. v. Quarles,* 92 F.2d 321, 324 (4th Cir. 1937). In exercising this discretion, the court must undertake "considerations of practicality and wise judicial administration." *Wilton,* 515 U.S. at 288, 115 S.Ct. 2137. Particularly where state law is "problematic," as it is here, principles of federalism and comity justify declining declaratory relief. *See Centennial Life Ins. Co. v. Poston,* 88 F.3d 255, 256–58 (4th Cir.1996).

Abstention is especially appropriate in this case, where the plaintiff has received equivalent relief in the declaration and injunction as to the RLA's preemption.

### C. Conclusions of Law.

1. The court has subject matter jurisdiction pursuant to 28 U.S.C.A. §§ 1331, 1337(a). While this court also has supplemental jurisdiction over any claims that do not arise under federal law under 28 U.S.C.A. § 1367(a) (West 1993), the court declines to exercise its discretion to grant declaratory relief as to such claims.

2. An actual controversy exists concerning the rights and obligations of the parties. NS's cause of action herein against Pratt is not moot.

3. Pratt's assertions of state law claims of tortious interference resulting from NS disciplinary investigations conducted under the procedures established in the CBAs are preempted by the RLA.

4. By commencing legal proceedings against NS to obtain injunctions prohibiting NS from conducting disciplinary investigations concerning alleged misconduct by NS employees who are also clients of Pratt, Pratt has interfered with and deprived NS of its rights under the applicable CBAs with the unions representing NS employees.

5. Such interference is likely to reoccur and cause NS irreparable harm, for which it is without an adequate remedy at law. NS's claim is not barred by the doctrine of laches.

6. NS is entitled to a declaratory judgment and permanent injunctive relief against Pratt as to Pratt's interference with NS's rights under the CBAs to conduct disciplinary investigations.

A final judgment will be entered this day.

