**Guy A. PANRELL, et al., Plaintiffs,**

v.

**The UNITED MINE WORKERS OF AMERICA, INTERNATIONAL UNION, an unincorporated labor organization, Defendant.**

**No. 92–146–E.**

United States District Court,
N.D. West Virginia,
Elkins Division.

Jan. 20, 1995.

---

Charles J. Crooks, Morgantown, WV, for plaintiffs.

Robert H. Stropp, Jr., Washington, DC, Grant Crandall, James M. Haviland, Charleston, WV, for defendant.

## ORDER

MAXWELL, District Judge.

Pending before the Court are defendant's objections to the Magistrate Judge's Proposed Findings of Fact and Recommendation for Disposition on Defendant's Motion for Summary Judgment.

This civil action arises, in part, under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. The amended complaint sets forth six counts, all of which essentially allege that the defendant breached its duty of fair representation and trust with reference to the distribution of proceeds from a settlement that was reached in a civil action (Kitt Litigation) brought in the U.S. District Court for the Western District of Pennsylvania.[1] In the Kitt litigation, the International Union, District 31, and Local 2095 of the United Mine Workers of America (UMWA) filed suit against Kitt Energy and several other companies on behalf of all of the members of Local 2095 to redress their loss of employment, recall and other rights under the collective bargaining agreement.[2] During the pendency of that action, a confidential settlement agreement was negotiated and consummated between UMWA representatives and Kitt Energy, Pike Coal Company, and the Standard Oil Company, whereby the settling defendants agreed to pay approximately 12 million dollars in two installments. However, the settlement agreement did not provide for a distribution formula.

The settling defendants tendered the first installment of nine million dollars to the International Union on January 31, 1992. The executive officers of the International Union distributed the first installment to approxi-

1. The amended complaint sets forth six counts. Count I, brought pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, alleges that the International Union breached its duty of fair representation by implementing an internal decision regarding the distribution of the settlement proceeds in a manner which was arbitrary, unreasonable, intentional and in bad faith. Count II, also brought under the Labor Management Relations Act, asserts that the International Union, in distributing the settlement proceeds to the entire membership of the Local 2095, breached its constitutional duty to each of the plaintiffs to faithfully represent them in the enforcement of their rights under the 1984 National Bituminous Coal Wage Act, thereby breaching its duty of fair representation under the Constitution of the International Union. Count III of the complaint alleges that the Union has breached its duty of fair representation by failing to provide certain information requested by plaintiffs. Count V alleges that such failure violates West Virginia law. Counts IV and VI allege violations of the common law of West Virginia.

2. In the Kitt litigation, it was alleged that the parties to the purchase and sale of the Kitt No. 1 Mine illegally conspired to transfer ownership so that the purchasers would not be obligated to recognize the UMWA as the collective bargaining representative at the Kitt No. 1 Mines, as was provided for in the 1984 National Bituminous Coal Wage Agreement (NBCWA). In the prayer for relief, the plaintiffs sought to have the court find Kitt Energy in breach of the NBCWA and to order the purchasers to "recognize the employment rights of all Union members employed at the Kitt No. 1 Mine." According to the International Union, throughout the Kitt litigation, the United Mine Workers took the position that all bargaining unit members who had filled out "panel forms" maintained employment rights at the Kitt No. 1 Mine, and were entitled to recover for that loss. "Panel rights" have been defined as rights held by each and every member of the bargaining unit to be recalled from layoff by their employer to its operations. These rights are said to exist perpetually, that is, they do not terminate at any given time. According to the International Union, the NBCWA includes these unusual employment/recall rights because production in the coal industry is cyclical in nature and the timing of recall is thus uncertain.

mately 525 union members, representing every member of Local 2095 who was on the UMWA panel, available, and able to work, as of August 1986, when the Kitt No. 1 Mine ceased its production of coal.[3] Plaintiffs herein contend that the distribution to the 525 members was a breach of the International Union's duty of fair representation since at the time the plaintiffs herein agreed to the settlement, the International Union had led them to believe that the proceeds would be distributed to just 207 local union members who had the greatest "expectation of recall."

The plaintiffs allege that prior to the International Union agreeing to the Kitt settlement, its authorized representative, Associate General Counsel Judith A. Scott, sought approval from Local 2095 representatives, Guy Panrell, Burgess Larry Gregory, and John Bennett and the representative of District 31, Jerry Miller. These individuals allegedly gave their consent to Ms. Scott based on the understanding that the net settlement proceeds would be distributed equally to those miners who had a "reasonable right of recall." According to the plaintiffs, that group consisted of approximately 207 members of Local No. 2095 who were actually working at the Kitt No. 1 Mine when production ceased in August 1986, since it was these individuals who were harmed by the illegal transfer of the mine. The plaintiffs in the instant action are among those approximately 207 union members.

Plaintiffs allege that as it became known that the money was intended for only those members who were working at the Kitt mine when production ceased in August 1986, other members of the Local who had worked at the mine prior to August 1986, began demanding a share of the money. Members picketed District 31 headquarters in advance of union nominating elections, and the plaintiffs allege that the feared effect that negative publicity might have in that regard served to motivate the International Union officers to change the distribution class from just the 207 union miners for whose benefit the aforesaid settlement was intended, to

some 525 union members, representing every member of Local No. 2095 who was on the UMWA panel, available, and able to work, as of August 1986, when the Kitt No. 1 Mine ceased its production of coal.

On December 17, 1993, defendant filed a Motion for Summary Judgment. Defendant urges in its motion for summary judgment, in part, that the International Union did not breach its duty of fair representation when it distributed the settlement proceeds from the Kitt litigation to all members of Local 2095 who were employed by Kitt Energy and retained recall rights.

By Order entered February 7, 1994, the Court referred defendant's motion to United States Magistrate Judge John W. Fisher, II, pursuant to 28 U.S.C. § 636 and Rule 72, Federal Rules of Civil Procedure, with directions to submit to the Court proposed findings of fact and recommendations for disposition. On June 1, 1994, Magistrate Judge Fisher entered his report, wherein he directed the parties to file any objections to the report within ten (10) days.

In accordance with this directive, on June 13, 1994, the defendant filed Objections to the Magistrate Judge's Proposed Findings of Fact and Recommendation for Disposition and a memorandum in support thereof. In its objections, defendant contends, among other things, that the International Union is entitled to entry of summary judgment against all plaintiffs since there is no genuine issue as to any material fact and the International Union's reconsideration and ultimate restructuring of the Kitt Energy settlement distribution scheme did not rise to the level of bad faith required to establish a breach of its duty of fair representation to plaintiffs.

Plaintiffs have not filed any response to defendant's objections. However, on June 14, 1994, plaintiffs filed their Comments to the Magistrate Judge's report. Plaintiffs contend that in order to prove a cause of action they need only establish that the officers of the International Union unilaterally changed the distribution method and they do not need to be more particular with regard to

---

**3.** The second installment, pursuant to an Order of this Court, was invested by the UMWA in

certain United States Treasury obligations, pending resolution of this civil action.

defendant's motivations. Moreover, while conceding that the case at bar does not involve unlawful discrimination based on race, sex, religion, or national origin, plaintiffs "wish to preserve their argument under the 'discrimination' and 'arbitrariness' prongs of the Vaca standard."

When the Court is presented with objections to a Magistrate Judge's report, 28 U.S.C. § 636(b)(1)(C) provides that the Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and that the Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.

The Court has now reviewed all matters of record, including the numerous briefs filed by the parties on defendant's motion for summary judgment, and after hearing oral arguments of counsel on July 25, 1994, the Court finds that there does not exist a genuine issue as to any material fact and it can rule as a matter of law in this matter. After ample time for discovery, the Court does not believe plaintiffs have met their burden of establishing defendant acted in bad faith in allegedly changing the distribution formula used to distribute the proceeds of the settlement in the Kitt litigation. Furthermore, the Court believes that defendant neither acted arbitrarily or with discrimination.

■ As indicated in the Magistrate Judge's report, in a substantive sense, the central issue in this case concerns the duty of fair representation. In the leading case of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court specifically defined the judicially developed doctrine of the duty of fair representation, as follows:

> Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

386 U.S. at 177, 87 S.Ct. at 910 (citations omitted). In other words, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916.

■ A union's conduct will be "arbitrary only if, in light of the factual and legal landscape at the time," its "behavior is so far outside a wide range of reasonableness, as to be irrational." *Air Line Pilots Association, International v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991).

■ Bad faith requires a showing of fraud, or deceitful or dishonest action. *Aguinaga v. U.F. & C.W. International Union,* 993 F.2d 1463, 1470 (10th Cir.1993). Bad faith may also be shown by evidence of "intentionally misleading" or "sufficiently egregious" misstatements by the union. *O'Neill v. Air Line Pilots Association, International,* 939 F.2d 1199, 1202–1203 (5th Cir.1991) (on remand from 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51). Courts have also analogized the bad faith concept to the duty owed by other fiduciaries to their beneficiaries. *See, e.g. Air Line Pilots,* 499 U.S. at 74, 111 S.Ct. at 1134.

Although factually dissimilar, the Court believes that the legal principles expressed in *O'Neill* are applicable to the case at bar. On remand, the Fifth Circuit in *O'Neill,* reviewed whether the union's conduct in entering into a strike/litigation settlement was discriminatory, in bad faith, or arbitrary. The *O'Neill* plaintiffs argued that the union had misrepresented the settlement negotiations with Continental Air Lines, and the protection they would be afforded as a result of the settlement, to induce them to support the settlement. They introduced evidence that the union had promised them throughout the strike that they would be able to ratify any strike settlement with Continental and then did not present it to them. In analyzing this conduct under the construct established by the Supreme Court, the Fifth Circuit noted that these representation were made during a highly charged strike and difficult litigation, and therefore viewed the union's misstatements "on this backdrop." *O'Neill,* at

1203. While the court did not "condone fabrications designed to mislead the membership," it held that "there must be a demanding standard for measuring such violations ..." particularly when perceived against the backdrop of an "intensely adversarial" and "highly charged" atmosphere when they were made. *Id.* at 1202–1203. "[T]his demanding standard should be that the alleged union misstatement must be 'sufficiently egregious' to be considered in 'bad faith' under the *Vaca* standards for establishing a [duty of fair representation] violation ..." that is, so "intentionally misleading" as to be "invidious." *Id.*

Viewing the summary judgment evidence in the light most favorable to the plaintiffs, the *O'Neill* court rejected their contention that the union's broken promise to allow them to ratify the settlement agreement was invidious, under the circumstances. *Id.* at 1203.

The plaintiffs in *O'Neill* submitted additional evidence that the union had promised that those pilots who had been forced to retire during the strike would be included in any settlement with Continental, that they retired in reliance on this promise, and that the union did not include them in the final settlement agreement. The court found that the union had not breached its duty of fair representation because

> these statements do not rise to the level of bad faith and intentional misrepresentation designed to harm the retired pilots ... Even if ALPA sacrificed benefits to the retired pilots for the greater good of the entire union membership, this choice will not support an inference of bad faith breach of ALPA's DFR. In negotiating conflicts such as the one ALPA faced with Continental, some groups within the union will always fare better than others. Arriving at a compromise that includes disparate benefits for various groups is not per se outside ALPA's discretion or the "wide range of reasonableness," ... to which it is entitled as the pilots' duly chosen bargaining representative. *Id.* at 1203–1204.

■ From the text of Rule 56 of the Federal Rules of Civil Procedure, it is clear that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Motions for summary judgment impose a difficult standard on the movant; for, it must be obvious that no rational trier of fact could find for the nonmoving party. *Miller v. FDIC,* 906 F.2d 972, 974 (4th Cir.1990).

■ However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). To withstand such a motion, the nonmoving party must offer evidence from which "a fair-minded jury could return a verdict for the [party]." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create fair doubt rather than encourage mere speculation. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). A district court must grant summary judgment if, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The Magistrate Judge found that the parties had agreed that there was no evidence of discrimination against a protected class of individuals. Further, the Magistrate Judge found that the evidence does not establish defendant acted arbitrarily or with discrimination against a protected class of individuals. Upon an independent *de novo* consideration of all matters now before it, the Court is of the opinion that there is no evidence that the defendant acted arbitrarily or with discrimination against plaintiffs. Ac-

cordingly, the Court hereby adopts the Magistrate Judge's findings that defendant did not act arbitrarily or with discrimination against a protected class of individuals.

Therefore, as the Magistrate Judge found, the issue under the *Vaca* standard becomes whether there has been "bad faith" in the Union's official representation of its members when the Union reconsidered and restructured the original distribution scheme.

In essence, plaintiffs allege that prior to giving their approval to Ms. Scott for the settlement of the "Kitt Energy Litigation," Ms. Scott represented to them that the proceeds would be distributed to just 207 of the more than 500 members of the panel. All of whom maintained their panel rights, and had a "reasonable right of recall." In support of their position, plaintiffs state that in discussing the potential settlement with Ms. Scott, it was necessary to determine the class of recipients before agreeing to any settlement because that was the only way they could determine whether the settlement amount was reasonable. They also discussed with Ms. Scott the possibility that the members who were laid off prior to 1986 would question any distribution which did not include them. Ms. Scott allegedly told Mr. Panrell that although those members still maintained panel rights, that they should not join in the settlement proceeds as they were laid off for reasons other than the illegal transfer of the mine.[4]

Plaintiffs insist that had Ms. Scott not assured them that only the 207 would receive the proceeds, then, like the plaintiffs in *O'Neill*, it is unlikely that they would have given their consent to settle.

Taking plaintiffs allegations as true, as the Court must in addressing a motion for summary judgment, the Court is of the opinion that the International Union, neither acted arbitrarily, nor with discrimination, nor in bad faith when through its agent, Ms. Scott, it allegedly represented to the plaintiffs that the proceeds would be distributed to just the 207, and then, after gathering further information and giving careful consideration to the most equitable method and scope of distribution, the International Union determined that the proceeds should be distributed to all of the approximately 525 members of Local 2095 who had lost their recall/employment rights at the Kitt Energy mine when it was illegally transferred.[5] The Court does not believe that such conduct rises to the level of bad faith as that phrase has been interpreted by *Vaca* and its progeny. In particular, when viewing the summary judgment evidence in the light most favorable to the plaintiffs, the Court finds that the plaintiffs have not presented sufficient evidence that the International Union's decision to re-establish the distribution class and method was "sufficiently egregious" or the statements made were so "intentionally misleading [as] to be invidious." Nor have the plaintiffs presented evidence of fraud, or deceitful, or dishonest action to meet the demanding standard of a bad faith breach of the duty of fair representation.

---

4. These members were allegedly laid off because of technological changes at the mine, and economic factors, unrelated to the illegal transfer of the mine.

5. Defendant states that "[a]fter entering into the Settlement Agreement, the International Union began gathering information to assist it in devising the most fair and equitable scheme for distributing the settlement proceeds to members of Local 2095." The Union "obtained pertinent information from questionnaires the members had completed, seniority lists, panel forms, the Kitt Energy litigation ..." Additionally, defendant contends that based on careful consideration of the information gathered by the Union and their knowledge of the Kitt Energy litigation, General Counsel Stropp and Associate General Counsel Scott analyzed the options available for distributing the settlement proceeds. In a letter to the International Union officers, they set forth what they believed were the available options and advised the International Officers that "the local officers and district 31 Vice–President Jerry Miller favor distribution only among the group of 207. The Local Officers themselves fall into this group. Their argument is premised on seniority.... This is legally defensible ... However, equally legally defensible, and more equitable taking seniority into consideration, is the formula [for distribution to the 525 ...] ..." The International Officers selected the option which provided for the distribution of the settlement proceeds to the group of 525. The International Officers then presented their decision to the International Executive Board which adopted the report without opposition.

Moreover, while evidence of improper motive for changing the distribution method might amount to bad faith-under certain circumstances, the Court believes that there is insufficient evidence to prove that the International Union was politically motivated, or motivated in any improper way, when it determined that instead of the distribution class consisting of just the 207 members that it should consist of the entire membership of Local 2095 for whose benefit the Kitt Energy litigation was brought. The International Union would have been remiss in its duties and obligations to its membership to have done otherwise. Therefore, the Court finds that plaintiffs have not raised a genuine issue of material fact that defendant acted in bad faith, or otherwise breached its duty of fair representation.[6] Accordingly, it is

ORDERED that defendant's Motion for Summary Judgment on the basis that defendant did not breach its duty of fair representation shall be, and the same is hereby, GRANTED.

 Defendant also seeks summary judgment on plaintiffs' pendant state law claims on the grounds that they are preempted by federal law. Where the state law claim challenges a union's representations of its members, as in the instant case, the matter is one which concerns federal labor policy and is preempted. *Peterson v. Airline Pilots Association*, 759 F.2d 1161, 1169–70 (4th Cir. 1985). Courts have held that a breach of the duty of fair representation claim brought under section 301(a) of the Labor Management Relations Act will preempt the power of the district court to exercise its pendent jurisdiction of a related state claim. *Id.* The Court believes that the state law claims are such that they are preempted by federal law. Accordingly, it is

ORDERED that defendant's motion for summary judgment on this separate ground shall be, and the same is hereby, GRANTED and this civil action shall be dismissed from the docket of the Court.[7]

The Clerk of Court is directed to send copies of this Order to all counsel of record in this civil action.

---

6. In a letter dated February 25, 1992, addressed to the UMWA Executive Board members from John E. Bennett, and attached as an exhibit to plaintiff's opposition to defendant's motion for summary judgment, he states

We, the Local Union officers, District Representative, Jerry Miller, and Judy Scott were all in agreement that this money was to be divided among people that were working at Kitt in August, 1986. We felt that these people were the ones that were effected by the breach of contract. Black Diamond had only employed approximately 128 people before Anchor took over. We felt the number of people employed in August of 1986 would have reasonable expectation of recall. This was the understanding then and now, unless Judy Scott has changed her position.

It is not a surprise that the representatives of the Local Union were in agreement that the settlement proceeds should be distributed to the smaller class, since they were the ones to benefit the most from distribution to a smaller class. It would appear that as officers of Local 2095, they were representatives, and fiduciaries, of the entire Local during the Kitt Energy litigation. As such, perhaps they should have urged the position that all members of the Local be included in any settlement proceeds.

7. Given the above rulings on the duty of fair representation claims and the pendent state law claims, the Court does not reach the issues of whether the statute of limitations had expired, or whether plaintiffs failed to exhaust their administrative remedies.