**Charles O'HARA and Jerry Howard, Appellees,**

v.

**DISTRICT NO. 1–PCD, MEBA, AFL–CIO, et al., Appellants.**

**No. 93–7121.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 31, 1995.

Decided June 23, 1995.

Diane Krejsa argued the cause, Baltimore, MD, for appellants. With her on the briefs was Susan Souder. Michael D. Derby, Hopkinton, MA, entered an appearance.

William A. Isaacson argued the cause, Washington, DC, for appellees. With him on the brief was Jonathan D. Schiller.

Before: BUCKLEY, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Appellants, four labor unions, bring this interlocutory appeal under 28 U.S.C. § 1292(a)(1) (1988), seeking reversal of the district court's preliminary injunction precluding them from disposing of approximately $12.5 million received by their common predecessor pursuant to an arbitration award. Asserting their right to these funds, appellees, two members of one of the unions, obtained the injunction in a suit under section 301 of the Labor Management Relations Act. We reject the appellant unions' argument that the district court lacks section 301 jurisdiction over this suit, but finding an insufficient likelihood that appellees will succeed on the merits of their claim to the funds, we vacate the preliminary injunction.

## I.

The arbitration award at issue in this case resulted from the breach of a series of collective bargaining agreements between the Pacific Coast District, Marine Engineers Beneficial Association ("PCD/MEBA"), on the one hand, and the Delta Steamship Company and Crowley Maritime Corporation, on the other. In 1981, PCD/MEBA entered into a three-year collective bargaining agreement with Delta, under which Delta agreed to use only PCD/MEBA engineers to crew its ships. The following year, Crowley purchased Delta. In 1983, Crowley agreed with PCD/MEBA that for the next ten years Crowley would continue to ply Delta's service areas only with Delta vessels and that it would not subcontract any Delta services. As a Crowley subsidiary, Delta then renewed its collective bargaining agreement with PCD/MEBA through 1987, and also made the agreement's terms applicable to three new ships—the "Sea Wolf vessels"—that Delta anticipated leasing.

Delta subsequently sold its assets and subleased the three Sea Wolf vessels to U.S. Lines, which had its own collective bargaining agreement with PCD/MEBA. U.S. Lines employed a number of both "permanent" and "temporary" (or relief) engineers on each of the three Sea Wolf vessels. In August 1986, facing financial difficulties and with PCD/MEBA's agreement, U.S. Lines reduced each vessel's permanent crew to five engineers. Shortly thereafter, U.S. Lines went bankrupt and returned the three ships to Delta, which by then existed only as a Crowley shell corporation.

Crowley in turn subleased the Sea Wolf vessels to another of its subsidiaries, American Transportation Lines ("ATL"). ATL did not have a collective bargaining agreement with PCD/MEBA, but instead employed engineers from another union. PCD/MEBA commenced arbitration against Crowley and Delta, alleging that they had breached their agreements to crew the Sea Wolf vessels exclusively with PCD/MEBA engineers for the ten years that had begun in 1983. Arbitrator William J. Usery found in favor of PCD/MEBA, leaving the parties to negotiate damages. The New York Supreme Court for New York County twice confirmed the arbitration decision, and the Appellate Division affirmed.

When the parties could not agree on damages, arbitrator Usery conducted supplemental arbitration proceedings, awarding PCD/MEBA damages of approximately $6 million, measured by the "per day, per vessel" wages and benefits lost to date "by the whole bargaining unit" as a result of ATL's failure to crew the Sea Wolf vessels with PCD/MEBA members. Mr. Usery also awarded the union prospective relief of over $6,500 per day throughout the remainder of the ten-year period. Although Mr. Usery stated that

Crowley could terminate this ongoing liability at any time by causing ATL to employ PCD/MEBA members on the Sea Wolf vessels, he did not require, as a condition of such termination, that ATL reinstate any specific employees, such as those who had previously worked on these vessels. Similarly, in calculating past damages, Mr. Usery explicitly rejected Crowley's claim that PCD/MEBA had to identify specific aggrieved individuals and then mitigate damages by any income those individuals had received during the period of the award. Mr. Usery concluded instead that "the violation ... goes to the Union's jurisdictional rights and that the harm in effect was suffered by the whole bargaining unit." He thus made the award "to the Union, for the benefit of unit members."

By the time Mr. Usery finalized this award (the "Crowley award"), PCD/MEBA had merged with the National Maritime Union ("NMU") to form MEBA/NMU. The Crowley award therefore went to this merged entity. Because Crowley chose not to terminate its ongoing liability, it ultimately paid MEBA/NMU approximately $12.5 million through 1993. MEBA/NMU placed $6 million into pension and benefits funds for MEBA members. From the balance of the award, the union proposed to distribute up to $1.4 million to certain "disadvantaged" union members, although it asserted that neither the Delta collective bargaining agreements nor the arbitration award obligated it to do so. The "disadvantaged" members consisted of 51 former PCD/MEBA members who had worked on the Sea Wolf vessels for U.S. Lines, including the fifteen permanent engineers at the time of the U.S. Lines bankruptcy. MEBA/NMU intended to use the remainder of the Crowley award in its discretion "for the benefit of all of the membership." Appellants' Brief at 13.

MEBA/NMU notified its members of its proposed distribution plan and established an internal grievance process through which members could contest the plan. Seven of the 5,000 former PCD/MEBA members, each a permanent engineer on the Sea Wolf vessels at the time of U.S. Lines' bankruptcy, challenged the plan before another arbitrator, Joseph Kiss. Alleging that MEBA/NMU was improperly using the Crowley award for its own operating expenses and as a cushion for its depleted treasury, they argued that it should instead pass the entire award on to them and the other PCD/MEBA members who had been permanent or temporary engineers on the Sea Wolf vessels at the time of U.S. Lines' bankruptcy.

Meanwhile, MEBA/NMU was facing increasing financial difficulties, as well as a number of internal conflicts stemming from its 1988 merger. *See, e.g., Licensed Div. Dist. No. 1 MEBA/NMU v. DeFries,* 943 F.2d 474 (4th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992); *see also United States v. Defries,* 43 F.3d 707 (D.C.Cir.1995) (criminal proceeding alleging fraud and corruption by certain union leaders). One such conflict related to the union's use of the undistributed remainder of the Crowley award. MEBA/NMU's Licensed Division, comprised of the approximately 5,000 former PCD/MEBA members, argued that MEBA/NMU could not use the undistributed funds for the benefit of the entire 28,000 MEBA/NMU members, but instead must dedicate its use to activities benefitting only members of the Licensed Division. The Licensed Division eventually filed suit in U.S. District Court for the District of Maryland, seeking dissolution of the 1988 merger and challenging MEBA/NMU's disposition of the Crowley award. The district court ordered MEBA/NMU to keep a portion of the Crowley award in escrow pending the outcome of the suit.

In settlement of the Licensed Division's suit and other court challenges, MEBA/NMU dissolved the merger in June 1993. The merger termination agreement, which Mr. Usery helped negotiate, provided that the unions could satisfy remaining MEBA/NMU liabilities with "the escrowed Crowley money, except that portion payable to injured engineers and/or the MEBA Funds." The termination agreement also provided that on June 4, 1993, four successor unions—now the four appellants here—would replace MEBA/NMU and equitably share its remaining liabilities.

Three days after the termination, the same seven employees who had challenged the un-

ion's distribution plan before arbitrator Kiss commenced this litigation in U.S. District Court for the District of Columbia under section 301 of the Labor Management Relations Act, asserting their right to the Crowley award. They charged MEBA/NMU, but not its four successor unions, with violating the Delta collective bargaining agreements, the Crowley award, and the union's duty of fair representation. The seven plaintiffs requested class certification on behalf of the 51 former PCD/MEBA engineers employed by U.S. Lines on the Sea Wolf vessels, and they sought a preliminary injunction against MEBA/NMU's transfer of any of the $12.5 million Crowley award to PCD/MEBA and against any other use of the escrowed funds or other portions of the Crowley award. The district court granted the preliminary injunction. *Wilkinson v. District No. 1–MEBA/ NMU,* No. 93–1137 (D.D.C. June 24, 1993) (order granting preliminary injunction).

Although not named parties to the suit, Dist. No. 1–PCD/MEBA and the other three successors to MEBA/NMU answered the underlying complaint and appealed the preliminary injunction to this court. Because it was no longer functioning, the named defendant, MEBA/NMU, did neither. In their appeal, the four successor unions moved for summary reversal of the preliminary injunction because the district court had not supported it with any findings of fact or conclusions of law. The seven plaintiff employees sought dismissal of the appeal, alleging that the appellant unions lacked standing because they were not parties to the proceedings in the district court. This court deferred its consideration of these motions and remanded the record to the district court, instructing it to explain its rationale for issuing the injunction. *See Wilkinson v. District No. 1– MEBA/NMU,* No. 93–7121 (D.C.Cir. Oct. 8, 1993). In July 1994, the district court issued a short statement of reasons, and on the same day granted the appellant unions' motion to be substituted as parties for defendant MEBA/NMU. *See Wilkinson v. District No. 1–MEBA/NMU,* No. 93–1137 (D.D.C. July 19, 1994) (order substituting parties); *Wilkinson v. District No. 1–PCD/ MEBA,* No. 93–1137 (D.D.C. July 19, 1994) (statement of reasons on remand). Later

that month, the district court denied the plaintiff employees' motion for summary judgment, denied the unions' motion to vacate the preliminary injunction, and dismissed Count II of the complaint, the duty of fair representation claim. *See Wilkinson v. District No. 1–PCD/MEBA,* No. 93–1137 (D.D.C. July 26, 1994) (order denying motion to vacate preliminary injunction); *Wilkinson v. District No. 1–PCD/MEBA,* No. 93–1137 (D.D.C. July 26, 1994) (memorandum and order finding jurisdiction under § 301).

By then, arbitrator Kiss had issued his decision regarding the employees' internal challenge to the union's distribution plan. He rejected the claim that the seven employees represented a class, as well as the claim that any individual employees were entitled to share in the Crowley award "beyond the time-honored backpay formula." He also concluded, however, that MEBA/NMU's distribution plan "does not afford Grievants recompense analogous to the time-honored backpay formula."

Meanwhile, PCD/MEBA had already revised MEBA/NMU's original distribution plan to provide the disadvantaged members something closer to the "time-honored" backpay amounts. Apparently satisfied by PCD/MEBA's revised plan, five of the seven plaintiffs obtained dismissal from this suit. *See Wilkinson v. District No. 1–MEBA/NMU,* No. 93–1137 (D.D.C. Dec. 22, 1994) (order granting motion to withdraw). The remaining two plaintiffs, appellees here, continue to prosecute the complaint in district court, and the preliminary injunction against MEBA/ NMU and its four successor unions remains in effect. The four appellant unions, with PCD/MEBA taking the lead, continue to challenge the preliminary injunction. Three primary issues are before us: (1) whether the district court has subject matter jurisdiction over the complaint; (2) whether the proceedings before arbitrator Kiss preclude the plaintiffs from pursuing this action; and (3) whether the preliminary injunction was proper.

## II.

As an initial matter, we reject the plaintiff employees' continuing assertion that

the four appellant unions lack standing to bring this interlocutory appeal because they were not parties to the case at the time they filed their notice of appeal. The district court has now substituted these four parties for MEBA/NMU, the original named defendant. *See Wilkinson v. District No. 1–MEBA/NMU*, No. 93–1137, (D.D.C. July 19, 1994) (order substituting parties). As the district court implicitly recognized, the four unions, as successors to MEBA/NMU, essentially were the real parties in interest from the time this suit commenced. Viewing this substitution as having cured any defect that previously may have existed in the notice of appeal, we treat the four appellant unions as though they were defendants from the outset of this case. *Cf.* Fed.R.Civ.P. 17(a) (substitution of real party in interest for party prosecuting a suit has same effect as if action had been commenced in the name of real party in interest).

The four appellant unions claim that section 301 of the Labor–Management Relations Act, which gives district courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization," 29 U.S.C. § 185(a) (1988), does not apply here because the underlying suit does not concern a violation of a labor contract, but rather a disagreement over the meaning of an arbitration award. The appellant unions also contend that this disagreement does not involve a breach of the duty of fair representation but is solely an internal union matter that section 301 does not reach. We disagree with both contentions.

■■■ Enacted in 1947, section 301 gives federal courts jurisdiction to enforce collective bargaining agreements, and in particular to enforce agreements to arbitrate labor disputes. *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562–63, 96 S.Ct. 1048, 1055–56, 47 L.Ed.2d 231 (1976); *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 451–56, 77 S.Ct. 912, 915–18, 1 L.Ed.2d 972 (1957) (discussing legislative history of section 301). It seeks principally to promote "industrial peace," *see Lincoln Mills*, 353 U.S. at 454–55, 77 S.Ct. at 916–17, but it also permits suits "seeking to vindicate 'uniquely personal' rights of employees such as wages,

hours, overtime pay, and wrongful discharge." *Hines*, 424 U.S. at 562, 96 S.Ct. at 1055 (citation omitted). In several early cases, the Supreme Court ruled that Congress intended section 301 to facilitate the development of a uniform body of federal labor law regarding collective bargaining agreements. *See Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103–04, 82 S.Ct. 571, 576–77, 7 L.Ed.2d 593 (1962); *Lincoln Mills*, 353 U.S. at 456–57, 77 S.Ct. at 917–18.

Section 301, of course, does not mention arbitration awards, but we think this is of no jurisdictional significance. The arbitration process gives "meaning and content" to the collective bargaining agreement; *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960), and the arbitration award here flowed directly from the arbitrator's finding that the employer had violated the collective bargaining agreement. As the district court properly recognized, "the agreement is both the subject of the award's analysis and the source of the award's authority." *Wilkinson v. District No. 1–PCD/MEBA*, No. 93–1137, at 4 (D.D.C. July 26, 1994) (memorandum and order finding jurisdiction under § 301). The plaintiff employees' central claim—that PCD/MEBA must disburse the entire arbitration award to them and to certain other aggrieved union members—depends entirely on what rights these employees had under the collective bargaining agreement. The plaintiff employees are merely seeking judicial enforcement of what they assert are their contractual rights, as conclusively interpreted in the arbitration award. The appellant unions' contention that section 301 is inapplicable here because the plaintiff employees' suit concerns only a dispute over the arbitration award and does not allege a violation of the collective bargaining agreement is thus incorrect.

The appellant unions also argue that section 301 does not provide jurisdiction over this suit because the unions have not breached their duty of fair representation, a judicially created duty, akin to a fiduciary duty, that requires a collective bargaining agent to avoid conduct that is "arbitrary, discrimina-

tory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *see Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 75–76, 111 S.Ct. 1127, 1134–35, 113 L.Ed.2d 51 (1991). The unions rest their argument on a series of "hybrid" cases that merge this duty with section 301 when employees allege that both their employer and their union have interfered with their rights under a collective bargaining agreement. *See, e.g., Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry*, 494 U.S. 558, 564, 568, 569 n. 6, 110 S.Ct. 1339, 1347 n. 6, 108 L.Ed.2d 519 (1990); *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 163–65, 103 S.Ct. 2281, 2289–91, 76 L.Ed.2d 476 (1983); *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 60 n. 2, 101 S.Ct. 1559, 1562 n. 2, 67 L.Ed.2d 732 (1981). We think the unions misread these cases.

The hybrid cases have their roots in the Supreme Court's 1962 holding in *Smith v. Evening News Association* that section 301 provides federal courts with jurisdiction not only over *suits* between an employer and a labor organization, but also over suits between an individual employee and an employer, provided the suit alleges a violation of a *contract* between an employer and a labor organization. 371 U.S. 195, 200–01, 83 S.Ct. 267, 270–71, 9 L.Ed.2d 246 (1962). In furtherance of section 301's purpose of encouraging the arbitration of labor disputes, the Court subsequently barred employees from bringing section 301 suits directly against their employers until they had first sought relief according to any applicable grievance procedures established by the labor contract. "[U]nless the contract provides otherwise," the Court ruled, "the employee must afford the union the opportunity to act on his behalf." *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965). At the same time, the Court recognized the danger of leaving the employee entirely at the mercy of the union:

> Contractual remedies, at least in their final stages controlled by union and employer, are normally provided; yet the union may refuse to utilize them or, if it does, assertedly may do so discriminatorily or in bad faith. "The problem then is to determine under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures."

*Hines*, 424 U.S. at 564–65, 96 S.Ct. at 1056 (quoting *Vaca*, 386 U.S. at 185, 87 S.Ct. at 914); *see Vaca*, 386 U.S. at 185–86, 87 S.Ct. at 914–15. The answer to this "problem," according to the Court, was the hybrid case: federal courts could grant an employee relief against both the employer and the union for the employer's violation of a collective bargaining agreement, provided the union had breached its duty of fair representation. *Hines*, 424 U.S. at 572, 96 S.Ct. at 1060.

■ We do not agree with the appellant unions' contention that these hybrid cases mean that employees must always allege a violation of the duty of fair representation in order to sue their union under section 301. The hybrid cases stand only for the proposition that if an employee has failed to obtain relief through the contractual grievance process for the *employer's* breach of a collective bargaining agreement, the employee may challenge the employer's breach of contract in federal court only by establishing that the union breached its duty of fair representation in connection with the grievance process. *See, e.g., Mitchell*, 451 U.S. at 61–62, 101 S.Ct. at 1563–64; *Hines*, 424 U.S. at 569–72, 96 S.Ct. at 1058–60. This principle protects the finality of arbitration awards and ensures that an employer will not twice be called to answer for the same conduct once it has prevailed in the grievance process, unless the union has tainted that process through a breach of its duty of fair representation. *See Hines*, 424 U.S. at 567, 96 S.Ct. at 1057–58. But this proposition does not mean that an employee may not sue a union for the *union's* independent breach of a collective bargaining agreement unless the employee can establish that the union also breached its duty of fair representation. When the employee alleges that the union itself has breached an obligation to the employee under the collective bargaining agreement, the policy reasons for requiring a violation of the duty of fair representation in the hybrid suits no longer apply. Proof of the contractual

violation alone should suffice, without requiring the employee also to establish that the union violated its duty of fair representation with conduct that was arbitrary, discriminatory or in bad faith. *Cf. United Steelworkers v. Rawson,* 495 U.S. 362, 374, 110 S.Ct. 1904, 1912, 109 L.Ed.2d 362 (1990) (holding that union could contractually undertake, in collective bargaining agreement, other duties towards member employees in addition to statutorily-imposed duty of fair representation); *IBEW v. Hechler,* 481 U.S. 851, 864–65 & n. 7, 107 S.Ct. 2161, 2170 & n. 7, 95 L.Ed.2d 791 (1987) (same).

In *1199 DC, National Union of Hospital & Health Care Employees v. National Union,* however, we appear to have adopted a contrary view when we quoted approvingly the Ninth Circuit's statement that "Section 301 will also support a suit by a union member against his union seeking redress from union interference with rights conferred on employees by employer promises in the collective bargaining agreement provided that such interference constituted a breach of the duty of fair representation." 533 F.2d 1205, 1208 (D.C.Cir.1976) (quoting *Buzzard v. Local Lodge 1040 Int'l Ass'n of Machinists,* 480 F.2d 35, 40 (9th Cir.1973)). Yet because we found in *1199 DC* that the plaintiffs' allegations—that the defendant union had failed to prosecute grievances and process medical forms on behalf of its members—did in fact amount to an allegation of a violation of the duty of fair representation, *see id.,* we had no need to determine whether a violation of the duty was a necessary prerequisite for all section 301 suits between an employee and a union alleging a violation of a collective bargaining agreement. Nor need we resolve this issue today, for as in *1199 DC,* the plaintiff employees' allegations in this case, if proven, also would amount to a violation of the duty of fair representation.

█ It is true, as the appellant unions argue in support of their contention that no breach of the duty of fair representation occurred in this case, that the employer has fully complied with the terms of the Crowley award. In their view, this case thus concerns purely an internal union matter, in which the employees seek enforcement of the

award only against their union. The district court agreed, dismissing Count II of the complaint—the duty of fair representation claim—on the merits. Although the plaintiff employees have not sought an interlocutory appeal of the dismissal of Count II, they continue to assert, in support of their jurisdictional argument regarding Count I—the section 301 claim—that their union in fact did breach its duty of fair representation. We of course remain free—indeed obligated—to address this issue, notwithstanding the district court's dismissal of Count II, because it is essential to the district court's jurisdiction over Count I, as well as to ours. *See Citizens for the Abatement of Aircraft Noise, Inc. v. Metropolitan Washington Airports Auth.,* 917 F.2d 48, 53 (D.C.Cir.1990), *aff'd,* 501 U.S. 252, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991).

█ While we in no way mean to suggest that the plaintiff employees in this case are likely to succeed in establishing that the union has wrongfully withheld portions of the Crowley award from them—in fact we express a contrary opinion in Part IV below—we conclude that this allegation, if proven, would amount to a violation of the duty of fair representation. Although we have limited the duty of fair representation "to matters involving an employee's dealings with his employer" or to matters having a "substantial impact" on the employee-employer relationship, *Kolinske v. Lubbers,* 712 F.2d 471, 481 (D.C.Cir.1983) (internal quotation marks and citation omitted), exactly such a matter is at issue here: the plaintiff employees' asserted contractual rights, vis-a-vis their employer, to compensation for their loss of employment on the Sea Wolf vessels. If the plaintiff employees' allegations are correct, the union's conduct has directly and significantly frustrated their ability to vindicate their contractual rights under the collective bargaining agreement. As the Supreme Court has held: " 'it makes little difference whether the union subverts the arbitration process by refusing to proceed ... or follows the arbitration trail to the end, but in so doing subverts the arbitration process by failing to fairly represent the employee. In neither case, does the employee receive fair repre-

sentation.'" *Hines,* 424 U.S. at 572, 96 S.Ct. at 1060 (quoting *Margetta v. Pam Pam Corp.,* 501 F.2d 179, 180 (9th Cir.1974)). To us, it likewise makes little difference whether the union instead subverts the arbitration process—and in turn the collective bargaining process—by fairly representing the employee throughout the arbitration but then, as the plaintiff employees allege here, by refusing to distribute the proceeds of the award to its rightful recipients. We therefore reject the appellant unions' contention that the district court lacked section 301 jurisdiction in this case.

### III.

We also reject the appellant unions' argument that even if the court has section 301 jurisdiction, this action is precluded by the Kiss proceeding. Characterizing the Kiss proceeding as an arbitration, they claim that the plaintiff employees agreed to be bound by it, and that they cannot now relitigate Mr. Kiss's decision. The plaintiff employees respond that the proceeding before Mr. Kiss was not a true arbitration, involving resolution by a neutral arbitrator, but instead an internal union proceeding before an arbitrator picked and paid for by the union. They never agreed to be bound, they claim, but participated only because of the union constitution's requirement of exhaustion of internal union remedies, a requirement the Supreme Court has held courts may enforce under appropriate conditions. *See Clayton v. International Union, United Auto., Aerospace & Agric. Workers,* 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981). The appellant unions reply that the plaintiff employees took a contrary position before Mr. Kiss, and that the plaintiff employees' own conduct during the course of the Kiss proceeding demonstrated their agreement to be bound.

■ We agree with the district court that the plaintiff employees' receipt of the union's letter regarding the distribution plan, in which the union unilaterally asserted that its internal grievance proceeding would be final and binding, did not amount to a contractual agreement to be bound. The appellant unions have pointed to no provision in the union constitution (nor in any other contract) that

might be thought to make the internal procedure final and binding on the employees, and we see no basis to disturb the district court's factual findings that the plaintiff employees did not otherwise agree to be bound. The appellant unions' arguments in this court about the preclusive effect of arbitration are thus irrelevant. Because the Kiss proceeding was not a contractual arbitration, but a nonbinding internal grievance proceeding, it does not preclude this action. We therefore turn to the propriety of the district court's preliminary injunction against the unions' disposition of the $12.5 million Crowley award.

### IV.

■ The district court issued its preliminary injunction to protect the plaintiff employees' ability to enforce a judgment if they prevailed on their claim of entitlement to the Crowley award. In doing so, the district court weighed the familiar four factors: plaintiffs' likelihood of success on the merits; the threat of irreparable harm to the plaintiffs absent the injunction; the threat of substantial harm to other parties if the injunction issues; and the public interest. *See Ayuda, Inc. v. Thornburgh,* 948 F.2d 742, 756–57 (D.C.Cir.1991), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 3026, 125 L.Ed.2d 714 (1993). We generally review the district court's weighing of these factors under an "abuse of discretion" standard, "except that to the extent the district court's decision hinges on questions of law our review is 'essentially *de novo.*'" *Transohio Savings Bank v. Director, OTS,* 967 F.2d 598, 614 (D.C.Cir.1992) (citation omitted). Here, the district court's decision regarding the likelihood of success on the merits turned solely on the interpretation of Mr. Usery's arbitration award, an interpretation that involves primarily a question of law. *Cf. Washington Metropolitan Area Transit Auth. v. Mergentime Corp.,* 626 F.2d 959, 961 (D.C.Cir.1980) (interpreting plain language of contract is question of law).

■ In response to this court's remand instructing it to justify the injunction, the district court made only the following state-

ment regarding the plaintiff employees' likelihood of success on the merits: "[P]laintiffs have presented evidence that prior arbitration awards customarily resulted in distribution of funds directly to union members. This evidence contradicts defendants' contention that the arbitrator intended the union to use the funds to meet its own administrative expenses." *Wilkinson v. District No. 1-PCD/MEBA,* No. 93–1137, at 2 (D.D.C. July 19, 1994) (statement of reasons on remand). With all due respect, we think this finding is insufficient to establish that the plaintiff employees are likely to succeed. That the customary union practice may be to share arbitration awards with union members has no necessary significance in determining whether, in this particular suit, the union has any *legally enforceable* obligation to share the award with these plaintiffs, and neither the district court nor the two plaintiff employees have pointed to any provision in the award that clearly required the union to do so. Even if the award is ambiguous and "customary practice" is the proper standard by which to resolve this ambiguity, in this very case PCD/MEBA (and before it MEBA/NMU) in fact had agreed to share a portion of the award with these plaintiffs. The district court has not explained why this sharing would not fulfill the union's obligations under the customary practice.

Beyond the district court's stated basis for issuing the preliminary injunction, the plaintiff employees make several arguments, based on both the language of the arbitration award and other uncontested evidence in the record, in support of the proposition that they are likely to succeed on the merits, that is, that they are likely to prove that the Crowley award obligated the union to distribute the award to specific employees. They first point to the statement in the Crowley award that it was "for the benefit of unit members." To us, however, this language does not support their position. The more natural reading of the award, which Mr. Usery made "*to the Union,* for the benefit of unit members" (emphasis ours), is that the union retained the authority to use the funds, and that it should do so for purposes that would inure to the benefit of the aggrieved union members. The sheer size of the award, flowing from Mr. Usery's refusal to require the mitigation of damages, is consistent with the proposition that the union would control the award, rather than merely assume an obligation to convey it to individual members.

Other aspects of the award's language and structure support this reading of the award. For instance, the appellant unions argue, persuasively we think, that Mr. Usery did not find that Crowley breached the Delta bargaining agreements because it failed to continue to employ the 51 PCD/MEBA members previously employed by U.S. Lines on the Sea Wolf vessels, but rather simply because it failed to use *any* PCD/MEBA employees on these vessels after U.S. Lines returned them. Mr. Usery's statements that "the violation herein goes to the Union's jurisdictional rights," and that "the harm was suffered by the whole bargaining unit," imply that he viewed Crowley's misconduct as having damaged the union itself, or at least to have harmed all of PCD/MEBA's members by forcing them to compete for fewer jobs. Mr. Usery thus declined to order Crowley to hire specific individuals if it wished to avoid future liability, just as he refused to reduce the damages by whatever income these 51 former employees had earned during the period of the award.

We find nothing elsewhere in the record that persuades us that the plaintiff employees are likely to succeed. If anything, the record provides further support for the contrary conclusion. For instance, although the union sought to share some of the award with the 51 former Sea Wolf employees, who were the members most directly aggrieved by the circumstances surrounding Crowley's breach, the plaintiff employees have failed to explain why the Crowley award, and not union custom or some other reason, obligated the union to do this, let alone that they should receive any more than the union had agreed to share. Moreover, a compelling inference from Mr. Usery's subsequent role in the negotiation of the merger termination agreement, which by its terms permitted the union to use some of the arbitration award for union administrative expenses, is that he did not view such use as inconsistent with the

award. Arbitrator Kiss also rejected the claim that the union had any obligation to disburse to particular members any portion of the award "beyond time-honored back-pay." Whether this "time-honored backpay" obligation originated in the award itself, in customary union practice, or elsewhere, his determination reinforces our conclusion that the plaintiff employees will have an uphill battle ahead of them if they are to succeed on the claim that they are entitled to the entire award.

The plaintiff employees next point to a letter written by the president of PCD/MEBA two weeks after the merger termination, in which the president stated that the Crowley award was "for the benefit of the Delta bargaining unit." Yet "for the benefit of the Delta bargaining unit" may simply have referred to all PCD/MEBA members eligible for assignments on any Delta vessels. Nothing in the record establishes who such individuals are, just as nothing in the record definitively establishes what Mr. Usery meant in his award by the terms "bargaining unit" and "unit members." According to Mr. Kiss, Mr. Usery used these terms to describe the entire union. More important, the plaintiff employees have yet to cite to any use of these terms that establishes the union's obligation to disburse the award to "unit" members, rather than merely to use the award in its discretion in ways beneficial to these members. Nor do they respond to the fact that, in the same letter from which they selectively quote, the PCD/MEBA president stated that he had warned MEBA/NMU not to use the Crowley award *except on behalf of the Licensed Division*—in other words, PCD/MEBA. In the same letter, he wrote approvingly of MEBA/NMU's use of the Crowley award "for general union expenses of the engineers indirectly affected by Crowley's actions."

The plaintiff employees claim finally that no arbitrator has ever awarded a marine union monies "for the benefit of its members" that the union has then been permitted to use for its treasury, and that such use might violate section 302 of the Labor Management Relations Act, which contains criminal prohibitions against an employer contributing funds to a union. *See* 29 U.S.C. § 186(a) (1988). In response, PCD/MEBA cites a number of cases in other industries where arbitration awards went directly to a union, *see, e.g., Local 369, Bakery & Confectionery Workers Int'l Union v. Cotton Baking Co.,* 514 F.2d 1235, 1236–38 (5th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 786, 46 L.Ed.2d 644 (1976); *In re Brutoco Engineering Const.,* 92 Lab.Arb. (BNA) 33 (1988) (Ross, Arb.), and points to the exception in section 302 that expressly permits a union to receive funds from an employer in satisfaction of an arbitration award, *see* 29 U.S.C. § 186(c)(2) (1988). We need not resolve these issues at this stage of the litigation, noting only that both the historical practice and section 302 are irrelevant if this particular arbitration award in fact permits the union to receive these funds for its own treasury. We remain skeptical that the district court could have had any reasonable basis to conclude that the plaintiffs were likely to prove the contrary.

The district court, of course, had to balance the likelihood of the plaintiffs' success with three other factors, including the threat of irreparable harm to them in the absence of the injunction. Turning but briefly to this second factor, we are unable to find a reasonable basis on which the district court could have concluded that, absent the injunction, the plaintiffs would face any more than a minimal threat that they would be unable to recover a judgment in their favor, were they to succeed on the merits. The two individual plaintiff employees would likely recover only a tiny fraction of the Crowley award for themselves. Even if the district court certifies the class, it is far from clear that the class would recover the entire $12.5 million Crowley award. Factoring in our view that the plaintiff employees are not likely to succeed on the merits, the actual risk to them simply does not justify a preliminary injunction in the face of the obvious burden this injunction imposes on the unions' ability to control their assets.

For the foregoing reasons, the preliminary injunction is *Vacated.*