# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1223

_____

Alan E. Thompson; Darrell G.    *
Hinrichsen; Keith P. Fogel; Wallace E.   *
Alm; Donald D. Boe,    *
   *
   *   Appeal from the United States
     Appellants,    *   District Court for the
   *   Northern District of Iowa.
     v.    *
   *
United Transportation Union,    *
   *
     Appellee.    *

_____

Submitted: October 20, 2009
Filed: December 8, 2009

_____

Before WOLLMAN, MURPHY, and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.


Alan E. Thompson, Darrel G. Hinrichsen, Keith P. Fogel, Wallace E. Alm, and Donald D. Boe, sued the United Transportation Union, alleging that the union breached its duty of fair representation by choosing to distribute the surplus of a settlement fund to the entire membership of the union, rather than distributing it to the

plaintiffs. The district court[1] granted the defendant's motion for summary judgment and dismissed the case with prejudice. The plaintiffs appeal, arguing that the district court erred in granting the motion for summary judgment. We affirm.

I.

In June 1996, United Transportation Union (the union) and Union Pacific Railroad Company (the railroad) agreed to settle a host of backlogged employee grievances to facilitate the merger of Chicago North Western Railway Company and Union Pacific.[2] The settlement required the railroad to provide a one-time lump-sum payment to the union of $9.5 million "in full settlement of all time claims and grievances of record . . . submitted by either the employee or the United Transportation Union through the second half of [the] April 1996 payroll period." The union and the railroad agreed to discuss and determine a method of allocating the settlement funds in the future, subject to the "basic understanding that this settlement is for all time claims as described above."

In August 1996, the union's General Committee of Adjustment No. 225 (the committee) met to determine how to distribute the settlement funds. Each local union elected a representative to serve on the committee, and the leadership of the committee was elected from the membership of the committee. At the initial meeting, the committee believed that the settlement would not cover all of the valid grievances.

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Judge for the Northern District of Iowa.

[2]The union and the railroad referred to employee grievances as "time claims," because the penalty for the violation of work rules was redressed by awarding additional wages measured in time based upon the severity of the violation. For example, an employee who was forced to skip a required break could file a time claim for between four and eight hours of additional wages. A road employee who was required to do yard work could file a time claim for an extra day of wages.

The committee therefore voted to establish three-person review panels to determine the validity and value of each grievance and then distribute the settlement fund on a pro rata basis for valid claims. The committee planned to divide the settlement fund by the total value of all valid claims, thus determining a payment ratio to pay all valid claims on a pro rata basis. Union locals were apprised of this planned method of distributing the settlement fund.

Over the next six years from 1996 to 2002, the review panels engaged in an intensive and time-consuming process of vetting the claims. Union officials traveled to each local office and considered the merit and value of each claim. Numerous claims were rejected as invalid. As the review process neared its end in August 2001, the general chairman of the union, John Babler, notified union officers that the settlement fund might exceed the total value of valid claims. Open debate ensued about how to distribute the settlement fund in light of the change in circumstances since the August 1996 meeting establishing the pro rata distribution plan.

In September 2002, the review panels completed their work and determined that the total value of valid grievances was $6.5 million. While the review panels were vetting claims, the union had succeeded in negotiating with the railroad for an additional payment to the settlement fund of compound interest on the claims and all retirement taxes on disbursements from the fund. The total value of the settlement fund, therefore, was $11.3 million, resulting in a $4.8 million surplus in excess of the value of the valid claims. The committee then initiated a process to reconsider how to distribute the settlement fund.

In October 2002, committee members proposed three distribution schemes. Option A entailed: (1) all valid claims being paid at full value, (2) the committee receiving $250,000 to cover the expense of the review process, and (3) distribution of the remainder of the settlement fund in equal portions to all active union members. Option B was the same as option A, except that all valid claims would be paid on the

previously agreed upon pro rata basis (the settlement fund divided by the total of all valid claims), with any unclaimed portion of the settlement fund to be distributed to active union members. Option C retained the previously agreed upon pro rata distribution plan, without any provision for the committee's expenses or distribution to the active union members. These three options were circulated to committee members before the meeting. The committee held an open debate, followed by a vote in which option A received fourteen votes, option B five votes, and option C one vote. Accordingly, in December 2002 the railroad distributed the settlement fund according to the provisions of option A. Individuals with valid claims received full payment for their claims, the committee received $250,000 for its expenses, and active members of the union received equal payments of $2,508.95.

From late 2002 until early 2003, plaintiff Thompson challenged the option A distribution plan through internal union procedures. Following the union's denial of his appeal, Thompson joined with the named plaintiffs in this case, and sued the union, claiming that it had violated its duty of fair representation. It is from the district court's grant of summary judgment for the union that the plaintiffs appeal.

## II.

We review the grant of summary judgment *de novo*. Thomas v. Union Pac. R.R. Co., 308 F.3d 891, 893 (8th Cir. 2002). Summary judgment is appropriate if the evidence, considered in the light most favorable to the nonmoving party, fails to raise a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id. We may affirm the district court on any basis evidenced by the record. Id.

The Railway Labor Act recognizes "the right of employees to organize and bargain collectively through representatives of their own choosing." 45 U.S.C. § 152. A union, once formed under the Act, has the power to bargain for all of the employees

in the bargaining unit. Id. The exclusive nature of this power gives rise to a correlative responsibility: the union has a duty to fairly represent all of the members of the bargaining unit. Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953). A union violates this duty of fair representation when its actions are arbitrary, discriminatory, or in bad faith. Vaca v. Sipes, 386 U.S. 171, 190 (1967); Hansen v. Qwest Communications, 564 F.3d 919, 923 (8th Cir. 2009). See generally, Clyde Summers, The Individual Employee's Rights Under the Collective Agreement: What Constitutes Fair Representation?, 126 U. Pa. L. Rev. 251 (1977).

A plaintiff who claims that a union has violated its duty of fair representation bears the burden of showing that the union's actions were arbitrary, discriminatory, or in bad faith. Brown v. Trans World Airlines, Inc., 746 F.2d 1354, 1357-59 (8th Cir. 1984). We will deem a union's conduct arbitrary if, given the totality of the circumstances, the union's conduct is so far from reasonableness as to be irrational. Cross v. United Auto Workers, Local 1762, 450 F.3d 844, 847 (8th Cir. 2006). Discriminatory conduct occurs when the union fails to serve "the interests of all members without hostility or discrimination toward any." Vaca, 386 U.S. at 177; Beardsly v. Chicago & North Western Transp. Co., 850 F.2d 1255, 1266-67 (8th Cir. 1988). We may find that a union acted in bad faith when there is evidence of fraud, deceitful action or dishonest conduct. Cross, 450 F.3d at 847.

Unions are afforded considerable deference in fulfilling their duty of fair representation, because the relationship between courts and unions is similar to that between courts and legislatures. Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 78 (1991). "Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." Id. Under this standard, plaintiffs have a substantial burden to survive a motion for summary judgment: they must produce evidence "showing that there was a genuine issue as to whether the [u]nion breached its duty of fair representation." Brown, 746 F.2d at 1357.

## A.

From the plaintiffs' perspective, the union engaged in something akin to "grievance horsetrading," Summers, 126 U. Pa. L. Rev. at 270-72, using the plaintiffs' grievances to gain a collective benefit for the entire union. They maintain that modification of the distribution plan was a breach of the 1996 settlement agreement, and they argue that the agreement indicated that the settlement fund was for the exclusive benefit of the individuals with unresolved grievances. Accordingly, the plaintiffs believe the individuals with grievances were entitled to all of the proceeds of the settlement, even if this resulted in greater than one-hundred percent payment on each valid grievance. The plaintiffs were prepared to receive less than one-hundred percent payment on a pro rata distribution plan if the value of the valid grievances exceeded the settlement fund, and they believe they should receive more than one-hundred percent payment if the opposite were true.

It is true that the aggrieved employees had individual interests in the grievances, and the union had a duty to represent their individual claims diligently. See id. at 270 ("The union . . . does not own the grievance, for the individual employee acquires legal rights under the collective agreement, and the union is the employee's agent to enforce those rights."). Had the union sacrificed the plaintiffs' claims for the collective benefit, its conduct would arguably have been both arbitrary and discriminatory. Id. at 272. But the union diligently pursued the individual grievances, negotiated for the full payment of all meritorious claims, and democratically decided to use the settlement surplus for the benefit of the entire membership. Individual employees under a collective bargaining agreement have an interest in their grievances and the union has a duty to pursue meritorious grievances, but neither the interest nor the duty reaches beyond full payment on valid claims. As the district court stated, the plaintiffs "had no legitimate expectation to recover anything more than the full value of their valid claims." D. Ct. Order of Dec. 15, 2008, at 17.

Regarding the argument that the union breached the 1996 settlement agreement, the agreement did not indicate that the settlement was for the exclusive benefit of the individuals with grievances. Rather, it merely said that the union and the railroad agreed to resolve the issue with a payment of $9.5 million "in full settlement of all time claims and grievances." It did not say that the $9.5 million was for the exclusive benefit of the aggrieved employees. Even if it had said that, mere breach would be insufficient: plaintiffs would still need to show that such breach was arbitrary, discriminatory, or in bad faith. Vaca, 386 U.S. at 190. No such showing has been made here.

B.

The plaintiffs spend a considerable amount of time arguing about the implication of O'Hara and Panrell, two cases involving claims of breach of the duty of fair representation related to the distribution of settlements. O'Hara v. District No. 1-PCD, MEBA, 56 F.3d 1514 (D.C. Cir. 1995); Panrell v. United Mine Workers of Am., Int'l Union, 872 F. Supp. 1502 (N.D. W. Va. 1995). In O'Hara, the court noted that a claim could succeed if the union had "wrongfully withheld portions" of the settlement. 56 F.3d at 1521. In Panrell, the court stated that a claim could succeed if reconsideration of the distribution plan had been done in bad faith. 872 F. Supp. at 1508. The courts in those cases, however, did not say that modification of a settlement distribution plan constitutes a *per se* breach of the duty of fair representation. Filtered through the tripartite analysis of duty of fair representation claims, breach only occurs when modification of the distribution plan is arbitrary, discriminatory, or in bad faith. Vaca, 386 U.S. at 190; Panrell, 872 F. Supp. at 1508.

In this case, the union proposed a pro rata distribution plan at a time when it thought that the settlement fund would not cover all of the valid claims. After a six-year claim-vetting process, the union realized that the fund would cover all of the

valid claims. It then held a lengthy debate on how to deal with the changed circumstances, and it chose option A. Choosing option A was a reasonable action, and, *a fortiori,* rational. By all accounts, the union's deliberations were transparent, measured, and democratic. There is no evidence of fraud, deceit, or dishonesty. Because the modification was neither arbitrary, discriminatory, or in bad faith, there was no breach of the duty of fair representation.

## III.

The plaintiffs have failed to show that there was a genuine issue as to whether the union violated its duty of fair representation. Accordingly, the order granting summary judgment is affirmed.

_____